Susan J. Carter, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Oil Trading Company, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 11523, 11524.    Promulgated September 17, 1947.

*John S. Keith, Esq.*, for the petitioners.
*Sheldon V. Ekman, Esq.*, for the respondent.

OPINION.

Disney, *Judge*: The primary question confronting us here is whether in 1943 Susan J. Carter had ordinary income or capital gain from collections made on the 32 commission contracts, which, it is agreed, had no ascertainable fair market value when distributed to her in the

corporate liquidation. The petitioner contends that, under section 115 (c) of the Internal Revenue Code, the surrender and exchange of her stock in the corporation for the corporate assets resulted in capital gain to her, and that, the contracts having had no ascertainable fair market value, the later collections thereon in 1943 were simply additional capital gain, to be added to the $21,065.79 reported by her for 1942 from distribution to her of other corporate assets. The Commissioner's position is that the payments were not the result of sale or exchange of capital assets, did not constitute a continuing liquidating dividend, and were "ordinary income earned and accrued after the dissolution of the corporation, and therefore not attributable thereto."

The petitioner relies primarily upon *Burnet* v. *Logan*, 283 U. S. 404, arguing that here, as therein, a sale or exchange was involved, with no ascertainable fair market value, and therefore the determination of seller's gain is to be postponed until payment. To this the respondent replies that here, unlike the *Logan* case, the petitioner had already recovered her $1,000 basis (in 1942, from the $21,065.79) ; moreover, that petitioner did not sell or exchange the contracts, but retained them, collecting on them. To this the petitioner answers that the previous recovery of basis is immaterial, and that the exchange was in the dissolution—of her stock for the assets in kind.

We consider it necessary first to dispose of the question as to whether the contracts, after distribution to Susan J. Carter, required further performance of services. If they did, at least in any material degree, the collections would represent ordinary income, as the parties seem tacitly to agree, since they argue the question of fact as to whether such additional services were required, and petitioner does not adduce specific authority in case there was such necessity for services. Upon this point we have concluded, and hold, that as to all of the contracts, except No. 410, no material additional services were required. We discuss hereinafter our conclusions as to contract No. 410. It is, in our opinion, inescapable that the corporation, a broker, was paid in every realistic sense for the usual function of a broker—bringing seller and purchaser into agreement. The printed form usually used by the corporation so indicates, for it merely confirms, to the seller, a sale for seller's account, and asks preparation and forwarding of contract for presentation to purchaser for approval and signature. The form states "will also confirm our understanding that we are to receive a commission of" (1 cent per barrel or 1 per cent of sales price, in the usual case), and when, as was done, the seller signed below "Accepted," it is clear the broker had an enforceable contract for the commission there named, dependent had upon performance of the contract by seller and buyer. True, the broker usually performed incidental services, such as passing to the seller the purchaser's nomination

of a ship for the cargo. It frequently drew the contract, and it kept itself cognizant of what was being done under the contract and billed the seller for its commission as delivery was made. But all this was merely a matter of "good business" in its own interest, directly or indirectly, with no obligation. The evidence is that there was no such custom of rendering such service, as would, as a matter of law, become a part of the contract. We conclude and hold that, except as to contract No. 410, no services were required of Susan J. Carter under the contracts. This conclusion does not overlook the recitation in the contract between her and the partnership to the effect that "substantial services are necessary," with reference to the contracts; for we consider that language, in part, a mere attempt to allege a consideration for the contract and in part a reference to the necessity for an office, clerical assistance, etc., necessary to collection of the commissions; and the recitation does not overcome the fact that neither the broker's confirmation, nor the contract, nor trade custom provides such obligation for further services.

This brings us to the question whether, absent requirement for further services, the collections on the contracts, in general, entailed ordinary income, or capital gain. We are required to determine whether distribution in liquidation of property having no ascertainable fair market value causes the proceeds of such property, when collected, to be considered capital gain (above the cost basis of the corporate stock canceled), even though the property is not sold or exchanged.

After examination of the authorities adduced, and many others, we are of the opinion that the collections upon the property just here involved (where no services are to be performed by the distributee) are (except as to minor amounts hereinafter examined) to be regarded as capital assets, and gain calculated at capital gain rates. In *Burnet* v. *Logan, supra*, the Supreme Court considered a situation where a sale of stock was made, payment to be made in proportion to ore mined, so that the market value of the agreement to pay could not be determined with fair certainty. The Court said that it was not necessary to place some approximate value on the contract for future payments, that, as payments on account of extracted ore come in, "they can be readily apportioned first as return of capital and later as *profit.* * * * When the *profit*, if any, is actually realized, the taxpayer will be required to respond. * * * The transaction was not a closed one. * * * She properly demanded the return of her capital investment before assessment of any taxable *profit* based on conjecture." (Italics supplied.) Thus, it is clear that, if there is a sale (or exchange) in part in consideration of a contract without ascertainable fair market value, taxation is deferred until collection under such

contract, and tax will be upon the *profit* over cost basis, and not upon ordinary income. This is answer to respondent's idea that Susan J. Carter's recovery of her cost basis in the primary distribution distinguishes the *Logan* case. Profit on a capital transaction is not ordinary income; and, under section 115 (c) of the Internal Revenue Code, there was exchange of stock in payment for the contracts distributed—a capital transaction. The respondent says it was a closed transaction. The *Logan* case says the transaction there "was not a closed one." Is there any reason, in the fact of exchange involved in liquidation rather than ordinary sale or exchange, to distinguish the *Logan* case from that here involved? We can find none. Both are sales, or exchanges, of capital assets (stock) for contracts of no ascertainable value. Section 115 (c), in our view, requires us to make no distinction. The *Logan* case speaks of *profit*, not ordinary income, after recovery of basis, and the transaction here is no more required to be treated closed than in that case. Nothing in the nature of liquidation distribution is seen to require an immediate closing, more than in an ordinary exchange, and the language of section 115 (c) provides no exception, in case of distribution of unascertainable values, from its mandate to regard the distribution as received in payment in exchange for the stock—and it immediately thereafter treats of "gain or loss to the distributee resulting from such exchange." We think that such a distributee, after realization on the contracts of more than cost basis, had gain requiring treatment under section 117.

*Bessie B. Hopkinson*, 42 B. T. A. 580; affd., 126 Fed. (2d) 406, is, in effect, the same as the *Logan* case, upon which it in part relies. There, a patentee conveyed his patent rights in consideration of an agreement to make payments based upon manufacturing done under the patent rights. After receiving under the contracts amounts exceeding his cost or other basis, the patentee placed the contracts in trust for his wife, the petitioner in the case. The question at issue was whether payments thereafter received by the beneficiary were ordinary income or capital gain. We held that they were capital gain, saying that, "In contemplation of law, every payment * * * was, * * * part of the purchase price of a sale of capital assets." It will be noted that the cost basis had been recovered, as here. In *Haynes* v. *United States*, 50 Fed. Supp. 238, the Court of Claims held that one who sold capital stock for cash, plus a promise to pay according to the amount of oil and gas produced from the properties involved, was taxable upon such payments when received as profits from sale of capital assets, under section 117 (a) of the Revenue Act of 1936, and not as current income. In *George James Nicholson*, 3 T. C. 596, the petitioner in 1931 sold corporate stock in consideration of cash, in excess of his cost basis, and 2 cents a gross ton of stone pro-

372

duced and shipped by the corporation. In later years he received payments under the contract. We held that they were taxable as capital gain, "since, as we have seen, they are periodic payments for the property sold in 1931." In *United States* v. *Yerger*, 55 Fed. Supp. 521, partnership assets were in 1913 transferred to a corporation in consideration of transfer to the partners of corporate stock and agreement to pay them a percentage of the corporate profits for 5 years. A partner assigned his interest in the profits to the defendant, who in 1936 received payments under the agreement. Citing the *Logan* and *Hopkinson* cases, the court held that, "where there is a right to receive the consideration for capital assets in installments, or upon contingencies, the transaction is not a closed one. * * * It has no ascertainable fair market value," and that the defendant's share of corporate profits were payments upon the purchase price of capital assets, as distinguished from ordinary income. The court relied upon *Imperial Type Metal Co.* v. *Commissioner*, 106 Fed. (2d) 302, affirming 38 B. T. A. 1531, involving the same company and transaction, where it was held that the payments were capital expenditures upon purchase price for capital assets and not business expense deductible by the corporation.

The respondent attempts to distinguish the above cases, urging that petitioner did not sell or exchange the contracts; that is, did not sell or exchange capital assets. The distinction is, in our view, untenable. She did, under section 115 (c), exchange capital assets—her stock. *Helvering* v. *Chester N. Weaver Co.*, 305 U. S. 293. Under the above authority, we hold that the petitioner's income from the contracts so far considered was taxable as capital gain.

We now come to consideration of contract No. 410, between the corporation and W. R. Davis, Inc. As to it, provision was made for 1 cent a barrel upon crude oil accruing to the seller over a period of 20 years, 1941–1961, and further, that the corporation would make its oil-selling services available to the seller and that the commissions would be payable between 1951 and 1961 only if selling service should be made available; also that the selling service would be available from 1941 to 1946 to Continental Oil Co., the purchaser, which was to pay 1 cent a barrel commission. During the life of the agreement, the corporation was to place at the disposal of W. R. Davis, Inc., or its successor or assigns, its sales facilities for the purpose of effecting sales of such of the crude oil as it might desire to offer for sale, but W. R. Davis, Inc., was to pay the commission "regardless of whether or not we [Oil Trading Co.], as brokers, shall have effected sales of such crude oil." The commission, however, was payable, *in any event*, between 1941 and

1951, and payable after 1951 up to 1961, provided the services were furnished by the corporation, partnership, or organization with which Harvey D. Carter may be associated; or conducted by his associates after his death. The selling services were maintained, but Continental Oil Co. automatically renewed the contract and sent Oil Trading Co. a copy and, monthly, a statement of deliveries, and Oil Trading Co. billed Continental. That is all that was done.

Under these circumstances, was the $9,594.97 received by Susan J. Carter under contract No. 410 ordinary income, or capital gain? Upon all of the evidence, we conclude it also was capital gain; for, though the contract did call for services, it specified that the commissions, prior to 1951, were payable "in any event" up to 1951, and only thereafter were payments dependent upon making services available. Though the provisions are perhaps rather inconsistent, we can, considering the whole contract, only conclude that prior to 1951 (which includes 1943, the year here considered) no services were prerequisite to collection of commissions, and that the original contract gave an absolute right thereto. Therefore, we hold that the $9,594.97 was paid not for services rendered or available, but was a part of the purchase price of a capital asset, the corporate stock, and was taxable as capital gain.

There remains for consideration the question whether $8,648.04 out of the $43,640.24 hereinabove discussed as received by Susan J. Carter in 1943 should be allocated to the income of the corporation for the year 1942, as the Commissioner treated it in the deficiency notice, basing his action on section 41 of the Internal Revenue Code,[1] on the theory that such treatment was necessary in order clearly to reflect the income of the corporation. Subject to what we say below with reference to a deduction from the $8,648.04 for salary of Harvey D. Carter, we conclude, after an analysis of the authorities cited, that the Commissioner acted properly. *Jud Plumbing & Heating, Inc.*, 5 T. C. 127; affd., 153 Fed. (2d) 681. Though petitioner endeavors to distinguish that case, we think the effort fails, for, despite differences in immaterial facts, in both cases income fully earned by a corporation prior to liquidation and dissolution was allocated to it, rather than to a stockholder-distributee of its contracts. We agree with the Circuit Court of Appeals that the corporation's earnings belong to it and lia-

---

[1] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48, or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year.

bility to tax thereon can not be discharged "by the simplest expedient of dissolution" and distribution of the right to such income. In the instant case, the corporation had fully earned the income, for the buyer and seller had been brought together in contracts, the contracts had been performed by them, and, because of such performance, the corporation had sent out bills for its earnings. Though the corporation was upon the cash basis, and had not, prior to dissolution, actually received the money, we think section 41 authorized the Commissioner to charge the income to it. See also *W. F. Trimble & Sons*, 1 T. C. 482, and *Guy M. Shelley*, 2 T. C. 62.

The petitioner further argues that, even if the $8,648.04 should be allocated to the income of the corporation for 1942, that amount is subject to deduction for $1,960.30 commissions billed by the corporation in 1941, but not received until 1942, and also is subject to deduction for half of the $8,648.04, which the petitioner contends was payable to Harvey D. Carter, the president of the corporation, for his services, because, it is said, he was by contract entitled to receive one-half of the corporation's gross income. We first dispose of the $1,960.30 item. Petitioner's theory here is that the respondent by his action placed the corporation on an accrual basis for 1942; therefore, bills sent out in 1941, though not collected until 1942 (just as in case of the $8,648.04 billed at the end of 1942 and collected in 1943), should be eliminated from 1942 income. We do not agree. The respondent does not put the corporation on the accrual basis, but merely affects one item of income in order clearly to reflect the annual income. This action grows out of the earning of the $8,648.04 by the corporation in 1942, and its dissolution before collection. In our view, it has no relation to the collection of cash in 1942 on accounts billed in 1941.

Next, as to the deduction claimed because of salary payable to Harvey D. Carter: Such amount was never actually paid to him, but we agree with the petitioner that, since the effort here is to reflect clearly the corporate income, we should consider any liability for such services to which the $8,648.04 is subject, for, since we are considering, contrary to fact, that the corporation received the income, we should consider also the proper deductions to which it would have been subject had it been received.

Our first difficulty here is with the record. It is true that upon trial counsel for the respondent (perhaps bothered by a question from the Court) corrected his statement that Carter was entitled to 50 per cent of the corporation's net income to state "gross," and it is also true that upon brief the respondent stated that Harvey D. Carter was en-

titled to receive one-half of the gross income of the corporation, but we can not but consider these statements as inadvertent, for they are contrary to the facts proved, which are, as we have found: That Harvey D. Carter, by resolution of August 11, 1937, in effect until corporate dissolution on December 31, 1942, was entitled to receive 50 per cent "of the company's gross income *after* deducting therefrom all moneys payable to James R. Sloane as compensation"; that Sloane's services became more valuable and he participated in the profits, receiving a percentage; and that the complications which this caused in the corporate framework were one of the reasons for decision to dissolve the corporation. Moreover, the petition alleges, and the answer admits, that up to December 31, 1942, Carter was entitled to one-half of gross income "after deducting therefrom the compensation payable to one James R. Sloane, an employee." We can not, despite respondent's references to Carter's right to 50 per cent of gross income, overlook the fact that in 1942 he was not entitled to one-half of the corporation's gross income, but only to such gross income *after* deducting all moneys payable to James R. Sloane as compensation, and that Sloane participated in the profits, receiving a percentage. It is significant that the word "after" is underscored in the resolution setting Carter's compensation. The record before us is altogether silent on the amount of compensation payable to Sloane in 1942, and we have no way of allocating the $8,648.04 between them. On the facts before us, Sloane was entitled to some percentage of that amount. It may have been a large percentage. We are, therefore, completely unable to deduct from the $8,648.04 any amount because of Carter's right to compensation. The determination of deficiency adding the $8,648.04 to the corporate income has not, on such facts, been shown to be error.

We further consider that the deduction of one-half of the $8,648.04 was unavailable to petitioner, Oil Trading Co., under the provisions of section 24 (c) of the Internal Revenue Code. In order to bar the deduction, all of the elements of section 24 (c) must be present. *Flynn Manufacturing Co.*, 3 T. C. 932. The parties seem to agree that the expense was not paid, and that the amount thereof would not, unless paid, be includible in the income of Harvey D. Carter, but they disagree as to the third element of section 24 (c). The petitioner urges that it is absent because it requires taxpayer and payee to be persons between whom losses would be disallowed under section 24 (b), and thereunder losses would not be disallowed between Oil Trading Co. and Harvey D. Carter, for this, the petitioner says, is a "case of distribution in liquidation," which section 24 (b) specifically

excepts from disallowance of losses. The respondent argues that this is no such situation, for we are not concerned with a distribution in liquidation between the corporation and Harvey D. Carter, he not being a stockholder, but merely a proposed payee of compensation; therefore, the respondent urges, all three subsections of section 24 (c) apply and the corporation may not have the deduction. We uphold the respondent's contention. In case of a distribution in liquidation, losses would be allowed between Harvey D. Carter and the corporation, but we are here considering the corporation and Carter not as liquidator and distributee, but as employer and employee for whose compensation deduction is asked. We hold that the third subparagraph of section 24 (c) is satisfied, and that the deduction is not available to the corporation.

Reviewed by the Court.

*Decision will be entered under Rule 50.*