George W. Potter v. Commissioner.
George W. Potter v. Commissioner
Docket No. 15083.
United States Tax Court
1948 Tax Ct. Memo LEXIS 104; 7 T.C.M. (CCH) 622; T.C.M. (RIA) 48167; August 30, 1948
Robert S. Eastin, Esq., and W. E. Baird, C.P.A., 921 Dwight Bldg., Kansas City, Mo., for the petitioner. Frank M. Cavanaugh, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined a deficiency of $157,176.55 in petitioner's income tax for the period January 1 - November 30, 1941, by increasing the gain reported on the sale of 510 shares of stock in the Skelton Lead and Zinc Co. and by minor adjustments not in controversy. Petitioner contends that the Commissioner erred in assigning a value of $236,241.59 to a contract for profit-participation in mine operations; received as part consideration for the sale, arguing that profits were so uncertain as to render the contract not susceptible of valuation. Having *105 recovered cost of the shares in 1941, petitioner reported profits received in that year as capital gain, and likewise reports profits received in 1942. Findings of Fact Petitioner, a resident of Joplin, Missouri, filed his income tax return for the period January 1 to November 30, 1941, with the collector of internal revenue for the sixth district of Missouri. He obtained permission from the Commissioner to file for an eleven-month period, and prepared the return on the basis of cash receipts and disbursements. Petitioner has been engaged for 35 years in the mining and smelting of lead and zinc ores in a mining field lying partly in Missouri, Kansas and Oklahoma, known as the tri-state area. For 30 years he has been employed by the Eagle-Picher Mining and Smelting Co. (hereafter called Eagle-Picher), the largest operator in the area, and in 1941 was its executive vice president and general manager in charge of operations and development work. He is well experienced in the mining industry, and has purchased and sold a number of mining properties for the company. In February 1941 petitioner was approached by Paul Childress who offered to sell him the capital stock of the Skelton *106 Lead and Zinc Co. (hereafter called Skelton), which since 1916 had been extracting zinc and a small amount of lead ores from a leased mine near Joplin, and concentrating the ores at its mill beside the mine. Petitioner had attempted to buy this stock from Childress' father a few years before, but his offer of $60 a share was not accepted. The stock was represented by 1,000 shares, of which 510 were owned by members of the Childress family and 490 by others. Rose Childress had acquired 125 shares in October 1940 from Paul Childress who valued the stock at $80 a share on his gift tax return. The sale, which was authorized by resolution of the shareholders at a meeting held January 15, 1941, was prompted by exhaustion of the known ore resources. By 1935 high-grade ores, yielding 6 per cent or more of metal content, had become scarce; drillings failed to disclose any sizable new deposits, and Skelton began to re-treat the accumulated ore residues of former years, known as tailings or chats in mining parlance. Improved methods of concentration (a term denoting the removal of dirt and rock in which ores are embedded) made such re-treatment profitable as much metal remained in the tailings *107 of ores concentrated by prior processes, and a number of small companies had been formed in the tri-state area solely for re-treating the tailings of exhausted mines. By the end of 1940 Skelton had nearly exhausted its tailings, and had found it unprofitable to retreat tailings which it had already re-treated. It continued to mine ore after 1935, but its principal income was derived from the tailings, and no new deposits of high-grade ore were discovered. Its books indicate the following gross sales and net operation profits: Gross Sales
Net Operation Profits
Year
Tailings
Mining
Tailings
Mining
1936
$124,472.57
$167,711.41
$43,723.90
$18,975.87
1937
200,279.73
245,413.10
83,646.44
42,635.14
1938
100,020.78
132,375.70
33,877.77
6,351.16
1939
139,350.14
186,207.57
44,468.47
11,968.46
1940
133,353.69
190,365.21
37,284.50
10,404.39
Net profit from January 1 to April 17, 1941, was $534.70. When Childress proposed a sale of the Skelton stock, petitioner approached K. R. Neal, whom he knew to be interested in exhausted mines. Neal, Clarence Niday and Claud R. Jones owned the Davis-Big Chief Mining Co. (hereafter called Davis-Big *108 Chief), a small corporation organized in 1931 which specialized in the retreatment of tailings and the working of old mines. Their company was then working on four such mines, but was losing money on one; the lease on another was about to expire, and having an efficient personnel and considerable equipment, they were interested in a new field of operation. At petitioner's suggestion Jones and Niday inspected the Skelton mine, and orally reported their opinion that a profit could be made from it. Davis-Big Chief was not in a financial position to buy the mine, but on the basis of their report petitioner began separate negotiations with Childress and with Neal which culminated in a general understanding that petition would purchase all the Skelton stock, paying $75 a share in cash or $90 a share in notes, as the shareholder might elect, and that he would sell the stock so purchased to Davis-Big Chief for the latter's note in the amount paid by him for the Skelton stock and for Davis-Big Chief's agreement to pay him 75 per cent of further profits until he should have received in all $300,000. To consummate the sale of stock to petitioner, Childress induced the shareholders to have Skelton *109 purchase and retire its 490 shares held by the minority group, paying them $75 a share, or $36,750, and this was done pursuant to appropriate resolutions of shareholders and directors. Payment arrangements were made with a bank. On April 17, 1941, the majority shareholders, members of the Childress family, then sold the remaining 510 shares at $90 a share to petitioner, who on the same day sold them to Davis-Big Chief, receiving the latter's 4 per cent demand note for $45,900 payable to him. Petitioner immediately endorsed and delivered the note to Paul Childress, acting for all the Childress vendors, in payment for the 510 shares. The note was given to petitioner pursuant to a written contract dated April 17, 1941, which incorporated the prior understanding between petitioner and the shareholders of Davis-Big Chief. This contract recited petitioner's sale of the 510 Skelton shares to Davis-Big Chief: "* * * for the agreed purchase price of Three Hundred Thousand Dollars ($300,000.00), payable Forty Five Thousand Nine Hundred Dollars ($45,900.00) evidenced by the company's demand note bearing four percent (4%) interest and the balance of Two Hundred Fifty Four Thousand One Hundred *110 Dollars ($254,100.00) in installment sums equal to seventy five percent (75%) of the profits earned by the Skelton Lead & Zinc Company after one hundred percent (100%) of the profits of the Skelton Lead & Zinc Company shall equal the sum of Forty-five Thousand Nine Hundred Dollars ($45,900.00), * * *" The contract then provided for the payment of 75 per cent of the profits as recited, defining them as gross receipts from the properties then owned by Davis-Big Chief over operating costs exclusive of depreciation, depletion and capital expenditures. It further stipulated that officers' and supervisors' salaries should not exceed $600 a month; that payments be made at thirty day intervals; that any monthly loss be carried forward to reduce future profits, and that the company was under no obligation to pay the $254,100 "except as herein provided." In October 1940 the price of lead and zinc was fixed by the Federal Government at a figure which in effect stabilized the price of lead and zinc concentrates at about $48 a ton. England, France and Canada were purchasing large quantities of these metals for war purposes, but the fixed domestic price limited the possible profits on concentrates. *111 In October 1941 the Office of Price Administration increased the ceiling for lead and zinc by one cent a pound, and this increase was reflected in a rise in the price of concentrates to about $55 a ton. Until October that price had fluctuated from $48.04 to $49.01. The ceiling price on the metals remained unchanged until July 1947, but after the United States entered the war and in February 1942, the War Production Board through the Metals Reserve Corporation put into effect the Premium Price Plan whereby expanded production of lead and zinc was stimulated by the payment of a subsidy. This plan led to the mining of ores of very low metal content, not normally extracted, for the amount received by producers as combined price and subsidy for a ton of concentrate thereafter ranged from a minimum of $80 to a maximum of $144 a ton. On April 17, 1941, it was generally believed in mining circles that the ceiling price of lead and zinc would have to be raised by OPA to provide the incentive necessary for maintaining production, but it was not known what, if anything, would be done by the Federal Government, and the future was shrouded in uncertainty. Mine operators favored an open market, *112 and a trade association, of which petitioner was a member, sought to protect their interests. In December 1941 petitioner made a trip to Washington, D.C., joining others in seeking a raise in ceiling price and in opposing the subsidy plan, of which he first heard the preceding October. While in Washington he learned that the subsidy plan was soon to be put into effect. After acquiring all the stock of Skelton, Davis-Big Chief began operations at the mine with equipment there available, and concentrated ores and tailings at the old Skelton mill, which was inefficient and needed expensive repairs for proper operation. Aware of this mill's condition, petitioner had a prior understanding with Neal that Davis-Big Chief would ship the ores and tailings for concentration to the Eagle-Picher central mill a mile or so away, and after some months of delay, during which Davis-Big Chief brought considerable equipment of its own to the mine, it did have the concentrating done at the Eagle-Picher mill. At the start operations were not promising, but prospecting later brought to light a good pocket of metal; in August and September 1941 two high-grade deposits were discovered; permission was obtained *113 from the Department of Interior to trim off ore from pillars left as mine supports, and by the mining of fractures and the following of joints, additional ore was struck from time to time. Unlike coal, zinc occurs in disconnected pockets which must be separately located. Initially the ores removed yielded a 5 1/2 per cent recovery, but later ores of a 2 1/2 per cent recovery were concentrated. Without the subsidy this type of ore could not have been profitably utilized. For 1941 and 1942 Skelton reported the following gross receipts and net incomes on its income tax returns: Gross
Net
Year
Receipts
Income
1941
$595,782.73
$49,719.30
1942
536,868.41
36,210.35
Pursuant to the contract of April 17, 1941, Davis-Big Chief paid to petitioner and petitioner paid to Paul Childress during 1941 the full amount due on the 4 per cent demand note in the following installments: $5,559 on July 21; $15,572 on September 17; $12,835 on October 16, and $12,792.50 on November 4. Petitioner received further from Davis-Big Chief under the contract $13,260 prior to November 30, 1941, and $62,981.59 prior to November 2, 1942. These amounts were reported on his income tax returns *114 for January 1 - November 30, 1941, and for the fiscal year ended November 30, 1942, respectively, as short term capital gains. On November 2, 1942, petitioner sold his remaining interest in the Davis-Big Chief contract to K. R. Neal for $160,000 cash, and reported the amount on his 1942 income tax return as a long term capital gain. In determining petitioner's income tax for the period January 1 - November 30, 1941, the Commissioner computed a gain of $236,241.59 from sale of the Skelton shares and included that amount in taxable income of the period. Opinion In computing a gain of $236,241.59 on petitioner's sale of the 510 Skelton shares to Davis-Big Chief, the Commissioner treated as selling price $282,141.59, a figure representing the sum of the $45,900 note, the $13,260 paid by Davis-Big Chief to petitioner in 1941, the $62,981.59 paid in 1942, and the $160,000 paid by Neal for petitioner's remaining rights under the sale contract. From this selling price the Commissioner deducted the shares' cost of $45,900. It is obvious that petitioner derived gain in the amount determined from the transaction but not in cash at the date of sale. At that time he received only property in *115 the form of a note and a contract for a 75 per cent participation in Davis-Big Chief's profits from the mine after its payment of the note. Section 111 (b), Internal Revenue Code, provides that in the computation of gain from the sale of property the amount realized therefrom shall be: "* * * the sum of any money received plus the fair market value of the property (other than money) received." Hence petitioner's selling price of the shares is literally not the cash which he later realized and which incidentally was somewhat less than the $300,000 maximum of the contract, but the fair market value on April 17, 1941, of the $45,900 note and the right to profits from Davis-Big Chief's operations at the mine. So recognizing, respondent argues that the note and profit participation rights had a fair market value on the sale date equal to the $282,141.59 determined as selling price. As there is no dispute that the note was worth face amount, the issue is narrowed to the $236,241.59 attributed to the profit participation rights. Respondent reasons that as an experienced mine operator petitioner on April 17, 1941, reasonably anticipated a material increase in ceiling *116 prices for zinc or a government subsidy to stimulate production because the prospects then indicated an involvement of the United States in war; that exposed ores observed by Neal and Niday in their inspection of the mine warranted expectations of profitable recoveries, as is evident from the $300,000 figure of the contract, and that the mine's record of earnings for the preceding five years was indicative that future operations would provide ample profits for eventual payments in the maximum amount set. An appraisal expert of the Bureau of Internal Revenue valued petitioner's contract as of the sale date at $182,461.20 on the basis of the mine's earning record and at $236,000 in the light of prospective war demands for zinc which would lead to increased prices or subsidies. Respondent contends that the latter value should be accepted as correct. Petitioner argues to the contrary that the contract had no ascertainable value on April 17, 1941, and that his venture was purely speculative. He admitted hope of a small profit but expressed the opinion that no one would have paid him more than $25,000 for his contract on the sale date. After a careful analysis of the evidence, which comprised *117 testimony of petitioner, Paul Childress and R. K. Neal, we are convinced that petitioner's contract involved a higher degree of speculation than that even normally inherent in mining operations. The Skelton mine had been worked since 1916; the re-treatment of tailings had produced the major part of its profits since 1935, and although some ore was extracted thereafter, drillings had failed to locate any new deposits, and by 1941 the tailings had been exhausted. The Skelton shareholders resolved to sell their stock, and when Childress approached petitioner as a prospective purchaser, petitioner entered into negotiations with a small company which did not engage in normal mining but specialized in "clean up" or salvage operations on exhausted mines. Under such circumstances past earnings of the mine are no proper index of the contract's value, for the continuance of past production levels was not to be anticipated. Respondent contends that by virtue of the inspection and report of Neal and Niday petitioner was aware that much profitable ore remained and that he could expect $300,000 from his contract. This view, however, is rebutted by Neal's testimony, and even more effectively by the *118 price at which the Skelton shareholders disposed of their stock, for it must be assumed that they knew at least as much about the mine's probable ore content as Neal and Niday learned from an inspection. Indeed, their selling price of $45,900 would be the best evidence of fair market value of the mine if petitioner's resale on the same day for the same amount plus his profit participation rights did not inject into the appraisal a new factor of consideration which deprives the first sale figure of conclusive significance. Petitioner in fact advances the argument that such price is conclusive of no value for the contract, but that argument must yield to the fact that Davis-Big Chief, paying the same price, undertook to initiate operations at the mine, contemplating only 25 per cent of profits earned after payment of the $45,900 note and giving petitioner 75 per cent. Neal testified that he expected to make some money, - a very obvious postulate for a commercial transaction. As a corollary, petitioner expected to make three times as much. Hence by the sale petitioner not only recovered his cost but acquired an operating arrangement from which he could theoretically derive $254,100 *119 more. He insisted at the trial that the $300,000 recited "selling price" was a figure which he never expected to receive, and Neal added that he never expected it to be paid. We are convinced that petitioner had no rational basis for such an expectation and that the Skelton shareholders would not have accepted petitioner's offer if the pockets of ore later discovered and if the subsidy or increased price of zinc could have been reasonably anticipated on April 17, 1941. The price of zinc was officially fixed on that dated and remained so fixed until a small increase was granted in October 1941. Highgrade ore pockets were not discovered until August, and significantly Davis-Big Chief's only payment on the $45,900 note prior to September was a small one of $5,559 made on July 21. Neal testified that at the start operations were discouraging, and this statement is supported by the payment record. Thereafter payments, which of course reflected profits, increased rapidly. The subsidy was granted in February 1942, and by November 30 petitioner had received $62,981.59 as his share of profits for 1942. But no willing buyer of petitioner's contract could have foreseen on April 17, 1941, either *120 the discovery of new metal pockets or the price increase or the subsidy. It was not then certain that the United States would be involved in war, and while foreign conflicts were creating an abnormal demand for metal, the possibility of a subsidy so high as to warrant the concentrating of ores having only a 2 1/2 per cent metal content would not, we believe, have influenced any but a highly speculative buyer. Petitioner sold the Skelton shares for a note of $45,900 that was paid off in 1941, and a contract the value of which depended entirely on the unlikely discovery of new ore pockets, on possible war demands, on official price regulation and on the chance of government aid. The purchaser was not even expressly required by the contract to conduct operations at the mine. In Burnet v. Logan, 283 U.S. 404, the Supreme Court deemed a contract subject to fewer contingencies than these not susceptible of valuation, describing it in words equally applicable here as a: "* * * promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with any thing like fair certainty. The promise was in no proper sense equivalent to cash. It *121 had no ascertainable fair market value. The transaction was not a closed one. * * * "* * * Ordinarily, at least, a taxpayer may not deduct from gross receipts a supposed loss which in fact is represented by his outstanding note. Eckert v. Burnet, 283 U.S. 140. And conversely, a promise to pay indeterminate sums of money is not necessarily taxable income. * * *" This doctrine has been followed in Cassatt v. Commissioner ( C.C.A., 3rd Cir.), 137 Fed. (2d) 745, and was applied in Commissioner v. Hopkinson ( C.C.A., 2nd Cir.), 126 Fed. (2d) 406, in holdings that contracts involving similar contingencies were not susceptible of valuation when made and that payments under them should be considered gain realized when received, after the taxpayer had recovered his basis for the consideration given. We are of opinion that these cases are controlling here. Cf. Susan J. Carter, 9 T.C. 364; George James Nicholson, 3 T.C. 596. Respondent cites Robert J. Boudreau, 45 B.T.A. 390; aff'd. (C.C.A., 5th Cir.), 134 Fed. (2d) 360, as to the contrary. But while rights therein valued on the date distributed *122 in a corporate liquidation involved the uncertainty of continued production of producing oil wells, contemporary sales of fractional interests in such rights by others supplied evidence of market value which is lacking here, and the wells besides were then yielding oil in substantial quantities. Respondent correctly stresses that the Court may consider subsequent facts and circumstances as corroborating his determination, citing Helvering v. Safe Deposit & Trust Co. of Baltimore ( C.C.A., 4th Cir.), 95 Fed. (2d) 806; Doric Apartment Co. v. Commissioner ( C.C.A., 6th Cir.), 94 Fed. (2d) 895; H. H. Miller Industries Co. v. Commissioner ( C.C.A., 6th Cir.), 61 Fed. (2d) 412. And such evidence would be entitled to some weight here if the ore content of the mine were the only valuation factor of the contract. But it was not. Petitioner's profits resulted principally from the entry of the United States into the war, the rise in the officially fixed price of zinc and a government subsidy which made it profitable to concentrate ore of very low metal content. The possibility of these developments on April 17, 1941, might have influenced a speculator to *123 take a gamble, but their subsequent occurrence does not lessen their character on that date as "circumstances not possible to foretell with anything like fair certainty." The Commissioner's determination is reversed. Decision will be entered under Rule 50.