Estate of Sam Marsack, Deceased, Betty Marsack, Administratrix, and Betty Marsack v. Commissioner.
Estate of Marsack v. Commissioner
Docket No. 66967.
United States Tax Court
T.C. Memo 1960-75; 1960 Tax Ct. Memo LEXIS 213; 19 T.C.M. (CCH) 398; T.C.M. (RIA) 60075; April 14, 1960
A. L. Skolnik, Esq., 710 North Plankinton Avenue, Milwaukee, Wis., for the petitioners. Delman H. Eure, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax of the petitioners for the year 1951 in the amount of $14,209.36 and for the year 1953 in the amount of $3,701.28. Petitioners have claimed an overpayment for the year 1951 in the amount of $1,544.52. The sole issue for determination *214 is whether the respondent has erred in valuing at $22,500 certain patent license agreements distributed to petitioner Sam Marsack in a corporate dissolution. Other issues raised by the pleadings have been settled by stipulation or conceded on brief, the result of which will be taken into consideration in a recomputation of tax under Rule 50. Findings of Fact All stipulated facts are found. Petitioner Betty Marsack is an individual residing at 1500 North Shoreland Avenue, Milwaukee, Wisconsin. She and Sam Marsack, who died on January 3, 1957, were husband and wife. Betty Marsack was duly appointed by the County Court of Milwaukee, Wisconsin, on January 30, 1957, as the administratrix of the Estate of Sam Marsack, Deceased. Sam and Betty Marsack filed joint Federal income tax returns for the calendar years 1951, 1952, and 1953 with the collector of internal revenue at Milwaukee, Wisconsin. Marsack Patents Corporation was organized under the laws of the State of Wisconsin. It was dissolved on December 15, 1951. At the time of the dissolution of Marsack Patents Corporation, Sam Marsack owned all of its outstanding capital stock, which had been acquired by him prior to November 30, 1950. *215 Marsack Patents was the grantee of four patents concerning certain improvements and inventions relating to mattresses. They are: United States Patent No. 2252268, granted 8/12/41, expiring 8/12/58. United States Patent No. 2279628, granted 4/14/42, expiring 4/14/59. Dominion of Canada Patent No. 404896, granted 5/19/42, expiring 5/19/59. Dominion of Canada Patent No. 420821, granted 6/13/44, expiring 6/13/61. At the time of the liquidation of Marsack Patents, these four patents were in full force and effect. Upon dissolution of Marsack Patents, Sam Marsack as sole stockholder received in distribution all of its assets, subject to all of its liabilities. Included among the assets received by Sam were: (a) All rights of Marsack Patents under a license and supplemental agreement between Marsack Patents and Triple Cushion Corporation. (b) All rights of Marsack Patents under a license and supplemental agreement between Marsack Patents and Parkhill Bedding Company, Ltd. (c) All rights of Marsack Patents under a license agreement between Marsack Patents and Parkhill Bedding Company, Ltd. Triple Cushion was organized on June 23, 1938, under the laws of the State of Delaware. *216 On December 13, 1948, the name of the corporation was changed to Restonic Corporation, but for present purposes it will be referred to as Triple Cushion. Triple Cushion was organized for the purpose of associating together in a nonprofit cooperative organization all licensees of the patents and patent applications held and controlled by Marsack Patents. Its function was to provide and service a cooperative program of merchandising, selling, procurement of materials and placement of national advertising for the licensees. It does no manufacturing and its income is derived from the licensees. The license agreement between Marsack Patents and Triple Cushion was executed on August 29, 1940. It concerns the United States patents owned by Marsack Patents and any related improvements which might subsequently be acquired. One purpose of the agreement was to revoke eight licenses previously granted individually by Marsack Patents and grant a single license to Triple Cushion so that it could grant sublicenses to the eight former licensees and other acceptable manufacturers. Under the Triple Cushion license, Marsack Patents granted that corporation the exclusive right throughout the United *217 States to grant sublicenses for the manufacture and sale of mattresses under the United States patents. Triple Cushion agreed to pay Marsack Patents a minimum royalty per month with respect to the former eight licensees of Marsack Patents, all of which became sublicensees of Triple Cushion, plus a minimum royalty with respect to each additional sublicensee obtained. The Triple Cushion license was modified by a supplementary agreement executed on May 24, 1944, to provide that the royalty payments should be 33 3/4 percent of the first $1,600 received from the sublicensees by Triple Cushion each month, but not less than a total of $540 per month. It provided a graduated scale for the payment of additional royalties based upon the amounts received by Triple Cushion from the sublicensees. The supplementary agreement also provided that in the event any of the original eight sublicensees of Triple Cushion should terminate their sublicense agreement, thereby reducing the fees received by Triple Cushion to less than $1,600, Triple Cushion would either: (a) Continue to pay Marsack Patents the minimum of $540 per month, or (b) Permit Marsack Patents to secure additional sublicensees for *218 Triple Cushion in order to restore the amount to $1,600 per month. The Triple Cushion license was to remain in full force and effect until the expiration of the final patent under which it was granted unless sooner terminated because of breach or default of either party. The expiration date of the final patent under which the license was granted, United States Patent No. 2279628, was April 14, 1959. If the Triple Cushion license was terminated for any reason, all sublicense agreements of Triple Cushion were to revert to Marsack Patents and otherwise remain in full force and effect and all rights to trademarks, trade names, advertising copy and good will of the particular business were also to revert to Marsack Patents. The sublicensing agreements between Triple Cushion and all of its sublicensees were the same except as to the amount of royalties to be paid to Triple Cushion and the territory alloted. The royalties were based upon the population of the territory assigned the sublicensee. The agreements between Triple Cushion and its sublicensees granted the sublicensee the right to manufacture and sell mattresses embodying the inventions and improvements covered by the United *219 States patents owned by Marsack Patents in a specifically defined territory. The sublicensee agreed to make certain minimum monthly royalty payments to Triple Cushion as set out in the agreement. The minimum payment to be made by each sublicensee after 1940 was $200 per month. Various discounts were provided in the event the total amount of royalties payable in any calendar year exceeded the minimum. Either party to the Triple Cushion sublicense agreement could terminate the agreement upon default of the other and the sublicensee could terminate at the end of any year upon 60 days' notice. Otherwise, the agreement was to continue until the expiration of the last patent under which it was granted. Marsack Patents granted Parkhill Bedding Company, Ltd., two licenses under the Canadian patents owned and controlled by it and any related improvements that might subsequently be acquired. Under Parkhill license executed in 1938, Marsack Patents granted the Parkhill Company the exclusive right to manufacture and sell mattresses under the patents within the western part of Canada. Parkhill agreed to pay Marsack Patents $250 each quarter, or a total of $1,000 per year. A supplemental *220 agreement to the 1938 Parkhill license was executed on March 1, 1946. It specifically defined the patents covered by the original license as Dominion of Canada Patent Nos. 420821 and 404896 and provided that Parkhill could manufacture the mattresses anywhere in Canada and sell them through mail-order houses anywhere in Canada. Under the Parkhill license executed in 1946, Marsack Patents granted Parkhill the exclusive right to manufacture and sell mattresses under the patents within the eastern part of Canada. Parkhill agreed under this license to pay Marsack Patents $500 for each quarter, or a total of $2,000 per year. Both Parkhill licenses were to continue until the expiration date of the last issued patent covered by the agreements unless sooner terminated. The expiration date of the last issued patent covered by the license, Canadian Patent No. 420821, is June 13, 1961. After 3 years from the date of its execution, Parkhill could terminate either license at the end of any year upon 60 days' notice. The license could be canceled by either party upon 60 days' notice in the event of default by the other. Upon termination of either Parkhill license for any reason, the patent covered *221 by it and all rights to trade marks, trade names, or advertising copy used by Parkhill in connection with the sale of the mattresses and any good will of the particular business would revert to Marsack Patents. During the period 1946 through 1951, Marsack Patents received royalties from Triple Cushion and Parkhill in the following amounts: Triple Cushion
Parkhill
1946
$11,639.77
$3,100.00
1947
10,576.82
3,000.00
1948
12,619.83
3,000.00
1949
13,569.15
3,000.00
1950
14,442.87
3,000.00
1951
11,357.40
2,250.00
During the years 1951 through 1958, Sam Marsack or his estate received royalties from Triple Cushion and Parkhill in the following amounts: Triple Cushion
Parkhill
1951
$ 750.00
1952
$13,488.26
3,000.00
1953
9,365.40
3,000.00
1954
9,321.60
3,000.00
1955
13,465.18
3,000.00
1956
15,024.73
3,000.00
1957
13,222.18
3,000.00
1958
12,000.00
3,000.00
At the time of dissolution of Marsack Patents, Sam Marsack as sole stockholder also received 784 shares of common stock in the Westfield Company, a Wisconsin corporation. The value of this stock as of December 15, 1951, was $12.50 per share. On the *222 Federal income tax return filed by Sam and Betty Marsack for the calendar year 1951, Schedule D (Form 1040), Sam reported a long-term capital gain from the liquidation of Marsack Patents. On the "Income and Expense Statement" filed in connection with the 1951 Federal income tax return, the following appears: Income
Royalties received
$750.00
Expenses
Amortization of Patents
375.00
(Patents capitalized at $22,500.00 to be written
off over a period of five years from December
1, 1951 or $375.00 per month) The $750 reported as royalties was received from Parkhill. On the "Royalty Income" schedule filed in connection with the Federal income tax return of Sam and Betty Marsack for the calendar year 1952, the following appears: Income
Royalties received
$16,488.26
Expenses
Amortization of Patents
4,500.00 *
The $16,488.26 reported as royalties is the total of the $13,488.26 received from Triple Cushion and the $3,000 received from Parkhill. On the Federal income tax return filed for the calendar year 1953, Schedule D (Form 1040), Sam and Betty Marsack reported as long-term capital *223 gain: Additional receipts - distribu-
tions in liquidation of Mar-
sack Patent Corp.
$12,365.40
Less: unrecovered cost
894.36 The $12,365.40 reported as additional receipts is a total of the $9,365.40 royalties received from Triple Cushion and $3,000 received from Parkhill. On October 14, 1954, Sam and Betty Marsack filed a claim for refund (Form 843) of income taxes paid for the year 1951. The reason given for this claim was: "During 1951, taxpayer received as stockholder upon liquidation of Marsack Patents Corp. certain patent rights which were erroneously valued at $22,500.00 resulting in a capital gain of $4,367.38. Taxpayer also reported gross receipts on patent rights as ordinary income. Under similar circumstances in Harry C. Westover v. Agnes F. Smith ( 173 F. 2d 90) and Commissioner v. Susan J. Carter ( 170 F. 2d 911) contract rights are not valued and any subsequent receipts are distributions in liquidation." The taxability of the liquidation of Marsack Patents was recomputed on the following schedule attached to the claim for refund filed for the year 1951: Received upon liquidation of Mar-
sack Patents Corp.
$ 8,907.78
Less: Value of patent rights in-
cluded
(22,500.00)
Net proceeds
($13,592.22)
Cost of stock in Marsack Patents
Corp.
4,540.40
Cost to be recovered
($18,132.62)
Loss shown on 1951 claim
1,000.00
Received as payments in liquidation
(royalties on contracts assumed)
December, 1951
750.00
Balance to recover 12/31/51
($16,382.62)
Received, 1952
16,488.26
Gain, 12/31/52
$ 105.64
*224 In determining the amount of the refund claimed for the year 1951, there was deducted a "Capital loss in accordance with Section 39.117(e)-1" in the amount of $1,000 as shown in the schedule attached to the claim for refund. On October 14, 1954, Sam and Betty Marsack also filed a claim for refund (Form 843) of the income taxes paid for the year 1952. The schedule attached to this claim is identical to that attached to the claim for refund of 1951 taxes. In determining the amount of refund claimed, the remainder of the unrecovered cost of the Marsack Patents stock as shown on the schedule was subtracted from the royalties received in 1952. The balance was reported as gain. The aggregate fair market value of the patents and licensing agreements received by Sam Marsack in liquidation of Marsack Patents in 1951 was $22,500. Opinion No dispute exists with respect to the law applicable to this controversy. It is conceded by both parties that amounts distributed in liquidation of Marsack Patents are to be treated as though such amounts either in cash or property had been paid in exchange for Sam Marsack's stock under section 115(c) of the Internal Revenue Code of 1939; that Sam *225 Marsack's stock was a capital asset held for more than 6 months; that the gain or loss to Sam Marsack involving the exchange of his stock for the assets of Marsack Patents is to be determined under section 111 and that under section 112(a) such gain is to be recognized in the year at issue; and that the amount of such gain is the sum of any money received in the exchange plus the fair market value of property received under section 111(a) and (b). It is conceded that should this Court determine, as we have in our Findings of Fact, that the fair market value of the three license agreements here involved was ascertainable and the amount thereof determined, the excess of such amount over the basis of Sam Marsack's stock (which basis is not here in dispute) constitutes long-term capital gain and that it follows that the distribution in liquidation is a closed transaction rendering royalties received on such agreements thereafter ordinary income. In that posture we view the controversy as presenting only a question of fact concerning which our Findings of Fact are dispositive. Petitioner takes the position that, because of our holdings in George J. Lentz, 28 T.C. 1157, and *226 in Susan J. Carter, 9 T.C. 364, affd. 170 F. 2d 911, the fair market value of patent license agreements such as those at issue is not ascertainable because of the contingencies inherent in such agreements and that, therefore, the Commissioner was in error in determining that the fair market value of the instant agreements was $22,500 and that the royalties received thereunder subsequent to the dissolution of Marsack Patents were in their entirety ordinary income. Respondent, on the other hand, contends that, Sam Marsack having by his 1951 income tax return valued said agreements and respondent having agreed thereto, their aggregate value is the amount set by Marsack and that it necessarily follows under the statute cited that the liquidation was a closed transaction and all royalties received in pursuance of said agreements subsequent to the date of liquidation of Marsack Patents are ordinary income. Inasmuch as the issue before us is solely one of fact, little may be gained from a discussion of the cases cited by the parties. No evidence has been presented here and both parties concede that none is available regarding the method employed by Sam Marsack *227 in making his valuation of the license agreements as of the date of the corporate dissolution. There is certain opinion testimony educed from a witness who was an officer and employee of Triple Cushion to the effect that neither the patents nor the licensing agreements thereunder involved herein had any ascertainable fair market value at the time of the corporate dissolution. It is not shown that he had any knowledge as to whether there was or was not a market for the patents and licensing agreements or that if there was a market, he ever made any investigation respecting the fair market value of the patents and agreements on the crucial date. In view of the substantial amounts of royalties shown to have been received by Marsack Patents from Triple Cushion and Parkhill during the years 1946 through 1951 and shown to have been received by Sam Marsack or his estate from Triple Cushion and Parkhill during the years 1951 through 1958, we think it is clear that the patents and licensing agreements had a substantial value on the crucial date. Consequently, in the absence of a showing that on such date there was no market for the patents and agreements, we are unable to find that they had *228 no ascertainable market value or that they did not have the fair market value of $22,500 at which Sam Marsack valued them on or about the crucial date. It is true that it has been held generally that where the performance by one party to a license agreement is not under the control, direct or indirect, of the other party, particularly where termination of such agreements may be brought about at the option of either party at any time, and where general business conditions in the industry concerned have a direct effect upon the use of or performance under the rights conveyed by such agreements, sufficient contingencies exist so that the fair market value of such agreements is unascertainable. However, in this case we have other evidence not present in those last referred to. Here we have a valuation placed upon the agreements by Sam Marsack at a time which predates the present tax controversy. We are not shown by this record that he was not fully aware of the tax consequences of his valuation, yet the burden is upon the petitioner to provide such proof if such is not the case. It is argued by *229 petitioner that later in his claims for refund for the years 1951 and 1952 Sam Marsack rejected such valuation, but we do not so read his claims. In his claim for refund for the taxable year 1951 the taxpayer stated that - "During 1951, the taxpayer received as stockholder upon liquidation of Marsack Patents Corp. certain patent rights which were erroneously valued at $22,500.00 resulting in a capital gain of $4,367.38. Taxpayer also reported gross receipts on patent rights as ordinary income. Under similar circumstances in Harry C. Westover v. Agnes F. Smith ( 173 F. 2d 90) and Commissioner v. Susan J. Carter ( 170 F. 2d 911) contract rights are not valued and any subsequent receipts are distributions in liquidation." as being the reason why his claim should be allowed. In his claim for refund for the taxable year 1952 he gave the following as such reason: "During 1952 taxpayer reported royalty income of $16,488.26 as ordinary income. Under Harry C. Westover v. Agnes F. Smith (173 F. 2d 90) and Commissioner v. Susan J. Carter (170 F. 2d 911) this income is a distribution in liquidation. This claim should be associated with *230 like claim for 1951." Particularly with respect to the language used by him in his 1951 claim, "contract rights are not valued," we think it is clear and we find that he did not reject his previous valuation of $22,500 but instead evidenced the fact that under the cases there cited he had wrongly come to the conclusion that no value was to be placed upon the agreements here involved in computing his gain upon liquidation of Marsack Patents regardless of the fact that such agreements may in fact have been subject to valuation and were in fact of the value he had by his return placed thereon. We are convinced that he, as owner of the license agreements, was fully aware of their value and was fully advised as to the tax consequences of his valuation thereof. For this reason, we have agreed with his valuation in our Findings of Fact. It follows that the liquidation of Marsack Patents is a closed transaction and that all receipts of royalties under the license agreements distributed to Sam Marsack constitute ordinary income to him. Because an aggregate basis for the assets distributed has been here found and because those assets (the license agreements) have varying remaining lives, *231 it is necessary to apportion the aggregate basis among the individual license agreements according to their remaining lives at the time they were acquired by Sam Marsack through liquidation of Marsack Patents. In so doing we avail ourselves of the method set forth in Kraft Foods Co., 21 T.C. 513, reversed on another issue (C.A. 2) 232 F. 2d 118. In accordance with our holding there, we find that the method of allocation to be used in the instant case is to compute the total unexpired life at the beginning of each taxable year at issue of all the license agreements distributed to and acquired by Sam Marsack and the amount of their remaining life expiring in each such year. The percentage of the remaining life expiring in each such year to the total unexpired life at the beginning of each such year is to be applied to the basis for all license agreements. The result of such application determines the amortization deduction available to petitioner in each year. Decision will be entered under Rule 50. Footnotes
*. Cost $22,500.00 amortized over 5 years.↩