Pacific Finance Corporation of California v. Commissioner.
Pacific Fin. Corp. v. Commissioner
Docket No. 31020.
United States Tax Court
1953 Tax Ct. Memo LEXIS 291; 12 T.C.M. (CCH) 419; T.C.M. (RIA) 53129; April 17, 1953
Joseph D. Peeler, Esq., 819 Title Insurance Building, Los Angeles, Calif., for the petitioner. Earl C. Crouter, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in the income tax liability of petitioner and affiliated companies totaling $15,734.84 for the year ended December 31, 1946. A depreciation adjustment is not contested. The sole issue is whether petitioner properly reported a profit realized in 1946 as a long-term capital gain, rather than as ordinary income. Findings of Fact *292 Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized under the laws of the State of Delaware, with principal office in Los Angeles, California. It filed a Federal income tax return for the year in controversy on the accrual basis with the collector for the sixth district of California. In 1943 David O. Selznick, Daniel T. O'Shea, and Ernest L. Scanlon indicated to petitioner their desire to sell for cash an interest in a photoplay entitled "Rebecca." On December 16, 1943, petitioner's Executive Committee adopted the following resolution after hearing a report from one of its officers: "WHEREAS, Mr. DeLauney gave an oral report advising that David O. Selznick and his associates had recently reacquired the ownership of the motion picture production 'Rebecca,' and that they were desirous of selling a four or five hundred thousand dollar interest in said photoplay; and Mr. DeLauney further advised that the owners contemplated the release of said photoplay within the next few weeks and that the owners had received an offer for the right of release for distribution in England only for approximately $240,000, and that the estimated *293 gross revenue from the release or distribution of said photoplay in England, the United States and Canada in the near future would produce at least $600,000, with a possibility of a revenue of approximately $1,000,000. "NOW, THEREFORE, BE IT RESOLVED, that the Management is hereby authorized to purchase a $550,000 interest in said photoplay for the sum of $450,000, said interest representing the right to receive the first moneys to the extent of $550,000 that may become due the owner from the world-wide distribution of said photoplay." Petitioner's execution of the proposed purchase agreement on December 22, 1943, was preceded by a written report to the Executive Committee by vice president A. M. DeLauney of December 18, 1943, which stated that: Messrs. Selznick, O'Shea, and Scanlon, the owners, held 90 per cent, 5 per cent, and 5 per cent interests, respectively, in the completed motion picture film; the proposal was that petitioner should "purchase without recourse to them, an interest in the future revenue from the exhibition of this picture throughout the world"; the picture was released for a first run showing in 1939; it cost $1,600,000, and after the first showing, which *294 grossed in excess of $2,000,000, the picture was withdrawn from the market on the theory that more profit could be made by reissuing it in the future; it received an academy award; J. Arthur Rank, British motion picture magnate, was negotiating for purchase of the British exhibition rights for $240,000; United Artists advised against selling the English rights because in their opinion they could secure $300,000 from such source; United Artists estimated that the picture would gross at least $800,000 in the United States and Canada, which, after distribution costs, would net the producer in excess of $500,000 more. Mr. DeLauney's report of December 18, 1943, concluded: "After considering and as far as possible, confirming all of the above factors, we believe that there is little doubt as to the value of this film and when measured by the English offer and the United Artists estimate, we can be assured of recouping sufficient revenue to justify the investment of $450,000. "I, therefore, recommend that we enter into a contract of purchase with the owners of the picture Rebecca in which we will agree to pay $450,000 for the first $550,000 of the owners' gross receipts, with the understanding *295 that United Artists, the distributors, will pay directly to Pacific Finance Corporation, all revenue received from the exhibition of this picture throughout the whole world after the distributors fees and costs as prescribed in the agreement between Selznick and United Artists have been deducted." On December 22, 1943, Messrs. Selznick, O'Shea and Scanlon (as parties of the first part) and petitioner (as party of the second part) executed the following instrument: "BILL OF SALE AND AGREEMENT, made and entered into this 22nd day of December, 1943, by and between DAVID O. SELZNICK, DANIEL T. O'SHEA and ERNEST L. SCANLON (hereinafter collectively called 'the Owners'), as parties of the first part, and PACIFIC FINANCE CORPORATION OF CALIFORNIA, a Delaware Corporation (hereinafter called 'Pacific'), as party of the second part. "WITNESSETH: "The parties hereto have agreed, and they do hereby agree, as follows: "FIRST: The Owners represent and warrant that by virtue of mesne assignments, they have previously succeeded to, and are now the sole and exclusive owners (a) of that certain feature motion picture photoplay entitled 'REBECCA' (hereinafter called 'the Photoplay') which *296 was produced by Selznick International Pictures, Inc., and based upon the Novel of the same title written by Daphne Du Maurier; (b) of all negatives, dupe negatives, and positive prints of the Photoplay, and (c) of the copyright in the Photoplay which was copyrighted and/or registered for copyright in the United States of America by and in the name of said Selznick International Pictures, Inc. on or about April 16, 1940 under Entry No. L-9550. "The Owners further represent and warrant that they have succeeded to all the rights of said Selznick International Pictures, Inc. in and to a certain distribution agreement applicable to the distribution of the Photoplay, among other photoplays (hereinafter called 'the Distribution Agreement') made and entered into the day of February, 1937, but as of July 17, 1935, by and between said Selznick International Pictures, Inc. and United Artists Corporation, a Delaware Corporation (hereinafter called 'United Artists'), as the same has heretofore been amended and modified, and that the Distribution Agreement, as heretofore amended and modified, and as the same relates to the Photoplay, is still in full force and effect, subject to the rights of *297 the Owners hereinafter in Article FIFTH hereof more particularly referred to. * * *
"SECOND: For and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable considerations, paid to the Owners by Pacific upon the execution and delivery hereof, the receipt of which is hereby acknowledged by the Owners, the Owners have sold, assigned, transferred and set over unto Pacific, and they do hereby sell, assign, transfer, and set over unto Pacific, effective as of the date of execution and delivery of this Bill of Sale and Agreement (a) all of the rent, revenue, income, compensation and profits of the Photoplay, obtained or to be obtained by the Owners from the the distribution of the Photoplay throughout the world, and (b) all of the rights of the Owners to receive payments from the distributor or distributors of the Photoplay. "TO HAVE AND TO HOLD all such rent, revenue, income, compensation and profits of the Photoplay, obtained or to be obtained by the Owners from the distribution of the Photoplay as aforesaid, and such rights of the Owners to receive such payments as aforesaid, until such time only (hereinafter called 'the Defeasance Date'), as Pacific *298 shall have derived therefrom the aggregate sum of Five Hundred and Fifty Thousand Dollars ($550,000.00). "It is expressly understood and agreed that from and after the Defeasance Date, written notice of which Pacific agrees to give immediately to United Artists (or to any other distributor or distributors) and to the Owners, this Bill of Sale and Agreement, and the sale, assignment, and transfer herein made by the Owners to Pacific as aforesaid, shall automatically become null and void, and thereafter cease to have any force and effect, except that Pacific hereby agrees promptly after the Defeasance Date to execute and deliver to the Owners an instrument in the form of Exhibit A annexed hereto and made a part hereof, pursuant to which it releases unto the Owners, their successors or assigns, any and all interest of every kind and nature whatsoever in and to the Photoplay and/or in and to the rent, revenue, income, compensation and profits of the Photoplay obtained or to be obtained by the Owners from the distribution of the Photoplay as aforesaid, and/or the rights of the Owners to receive such payments as aforesaid, and at which time Pacific shall also execute and deliver any other *299 different instrument or instruments, requested by the Owners, which shall be necessary or proper in the premises. "THIRD: This Bill of Sale and Agreement, and all the rights herein granted by the Owners to Pacific, shall be expressly subject in all respects to all the rights of United Artists under the Distribution Agreement, and, subject to the provisions of Article FIFTH hereof, to all the rights also of any other distributor or distributors under any other distribution agreement or distribution agreements pertaining to the Photoplay which shall hereafter, and prior to the Defeasance Date, be made and entered into with the Owners, their successors or assigns. "FOURTH: For all purposes of this Bill of Sale and Agreement, the rent, revenue, income, compensation and profits obtained or to be obtained by the Owners from the distribution of the Photoplay as aforesaid, and the rights of the Owners to receive payments from any distributor or distributors of the Photoplay as aforesaid, shall be deemed to mean the Owners' share of the gross receipts (referred to in the Distribution Agreement as 'the Producer's share of the gross receipts') from the distribution of the Photoplay throughout *300 the world, all as more particularly specified in the Distribution Agreement (or under the terms of any other distribution agreement or distribution agreements with respect to the Photoplay as aforesaid). * * *
"SIXTH: The Owners will use their best efforts to cause United Artists (or any other distributor or distributors of the Photoplay) to give the Photoplay the widest distribution possible at all times, commencing immediately after the execution and delivery hereof (contingent, however, upon the time necessary to negotiate and close the most favorable deals as respects particular territories), and to obtain the best possible terms from exhibitors of the Photoplay, provided, however, that, of necessity, the Owners and/or United Artists (and/or any other distributor or distributors of the Photoplay) must necessarily reserve and exercise their own best judgment with respect to all the foregoing, and, so long as the Owners and/or United Artists (and/or any other distributor or distributors of the Photoplay) act in good faith, their judgment and actions in all such matters shall be binding and conclusive upon Pacific. "Pacific is aware of the fact, and it so hereby acknowledges, *301 that the Photoplay has previously been distributed throughout the word, by United Artists under the Distribution Agreement. SEVENTH: So long as this Bill of Sale and Agreement continues to remain in force and effect, and, until the Defeasance Date, all the rent, revenue, income, compensation and profits obtained or to be obtained by the Owners from the distribution of the Photoplay as aforesaid, and all payments to which the Owners are entitled with respect to the Photoplay as aforesaid, shall be paid directly by United Artists (or by any other distributor or distributors of the Photoplay) to Pacific, and the Owners agree to obtain from United Artists as the distributor of the Photoplay under the Distribution Agreement (and from any other distributor or distributors of the Photoplay under any other distribution agreement or distribution agreements) the agreement of United Artists (or of any such other distributor or distributors) to pay directly to Pacific, from and after the date of execution and delivery hereof, but only so long as this Bill of Sale and Agreement shall continue in force and effect and until the Defeasance Date (at which time there shall have been received by Pacific *302 the sum of Five Hundred and Fifty Thousand Dollars ($550,000.00) as aforesaid) all of the rent, revenue, income, compensation and profits obtained or to be obtained by the Owners from the distribution of the Photoplay throughout the world. The agreement of United Artists so to do shall be in substantially the form of the instrument entitled 'Acceptance and Agreement' annexed hereto as Exhibit B and made a part hereof. * * *
"NINTH: It is expressly understood and agreed that the transaction which this Bill of Sale and Agreement covers and describes, and which it is intended to cover and describe, is and shall constitute a sale, assignment and transfer by the Owners to Pacific of a defeasible interest as aforesaid in the Owners' profits from the distribution of the Photoplay throughout the world, and that the same is not, and under no circumstances shall it be deemed or construed to be, a loan or advance by Pacific to the Owners. It is expressly understood and agreed that the Owners are and shall be under no obligation whatsoever to pay or repay any sums of money, or other benefits whatsoever, to Pacific by virtue hereof other than the obligation of the Owners as aforesaid to *303 pay or to cause to be paid to Pacific the Owners' share of the gross receipts from the distribution of the Photoplay throughout the world within the limitations aforesaid: further, that the Owners have not guaranteed to Pacific, and they do not guarantee to Pacific, that the Owners' share of the gross receipts from the distribution of the Photoplay throughout the world will equal or exceed such sum of Five Hundred and Fifty Thousand Dollars ($550,000.00) or any other lesser sum." * * *
The agreement of December 22, 1943 had attached to it a form of release to be executed by petitioner, upon receipt of $550,000 out of profits from the picture, releasing back to the owners "all the right, title, and interest, if any, of the undersigned, of every kind and nature," in the photoplay, and "all the right, title, and interest acquired" under the agreement of December 22, 1943. On December 22, 1943, another document entitled "Acceptance and Agreement" was executed by United Artists Corporation, and agreed to in writing by petitioner and the owners of the photoplay, paragraph 3 of which agreement provided for payment of $550,000 to petitioner as follows: "3. In pursuance of the provisions *304 of said Bill of Sale and Agreement, United Artists hereby agrees to pay directly to Pacific, all the rent, revenue, income, compensation and profits obtained or to be obtained by the Owners from the distribution (from and after said December 22, 1943 date) of the Photoplay by United Artists under the Distribution Agreement until such time only, however, as it shall have paid to Pacific as herein provided the aggregate sum of Five Hundred and Fifty Thousand Dollars ($550,000.00). Such rent, revenue, income, compensation and profits is referred to in the the Distribution Agreement as 'the Producer's share of the gross receipts.'" On December 22, 1943, petitioner issued to Messrs. Selznick, O'Shea, and Scanlon, jointly, its check for $450,000 and entered the payment on its books under a ledger account entitled "Investment in Photoplay 'Rebecca'," with the initial notation "Purchase of first $550,000.00 of Producers' receipts." The recording of the transaction as an investment was made upon the recommendation of Haskins & Sells, petitioner's accountants. Petitioner could not borrow against investments of this nature. The photoplay "Rebecca" was originally released in 1939 and was later *305 withdrawn from the market after all the production costs had been made. In December 1943 it was planned to reissue this photoplay for exhibition throughout the world. Petitioner's interest in the photoplay "Rebecca" was not a part of petitioner's inventory or stock in trade, nor was it held for sale to customers in the course of petitioner's business. There was at the time of acquisition no intention to sell it. This interest was not real estate or depreciable property or a government obligation. Petitioner has never had another transaction similar to the "Rebecca" deal. Prior to December 22, 1943, the only dealing petitioner had with the motion picture industry was a loan to Vanguard Films, Inc., for the production of a motion picture, which was authorized by petitioner's board of directors on November 10, 1943. Under the above-mentioned agreements various payments aggregating $375,223.24 were made to Pacific during 1944 and 1945, leaving an outstanding balance of $74,776.76 based upon the original $450,000, and a balance of $174,776.76 due to Pacific under the agreements, as shown by petitioner's account designated "Investment in Photoplay 'Rebecca'," which also states that this *306 represented "Purchase of first $550,000.00 of Producers' receipts." Certain accounting records of petitioner relating to annual audits of petitioner's books referred to the "Rebecca" contract and transaction as an investment representing an interest in the owners' share of the receipts from the reissuance of the motion picture; as petitioner's "Interest in gross receipts from the photoplay"; and "Interest in gross receipts of photoplay 'Rebecca'." On its published Annual Reports to Shareholders for the calendar years 1943, 1944, and 1945, the interest in the photoplay "Rebecca" was reported under "investments." On January 2, 1946, petitioner executed and delivered to Vanguard Films, Inc., a California corporation, a document as follows: "BILL OF SALE AND ASSIGNMENT "WHEREAS, the undersigned, PACIFIC FINANCE CORPORATION OF CALIFORNIA (hereinafter called 'Pacific'), has heretofore made and entered into a certain Bill of Sale and Agreement, dated December 22nd, 1943, with DAVID O. SELZNICK, DANIEL T. O'SHEA and ERNEST L. SCANLON (hereinafter called the 'Owners'), pursuant to which Pacific has purchased and acquired an interest to the extent of Five Hundred Fifty Thousand Dollars *307 ($550,000.00) in all the profits obtained or to be obtained by the Owners from the distribution throughout the world of that certain feature motion picture photoplay entitled 'REBECCA' (hereinafter called the 'Photoplay'), all as more particularly provided in said Bill of Sale and Agreement; and "WHEREAS, under date of May 15, 1945, all the right, title and interest of the said DAVID O. SELZNICK, DANIEL T. O'SHEA and ERNEST L. SCANLON, respectively, in and to the Photoplay and the profits to be obtained therefrom, was sold, assigned, and transferred to Vanguard Films, Inc., a California corporation; and "WHEREAS, Pacific hereby acknowledges that as of the date of this Bill of Sale and Assignment it has received an aggregate amount of Three Hundred Seventy-five Thousand Two Hundred Twenty-three and 24/100 Dollars ($375,223.24) out of such profits. "NOW, THEREFORE, in consideration of the sum of One Hundred Seventy-four Thousand Seven Hundred Seventy-six and 76/100 Dollars ($174,776.76), receipt of which is hereby acknowledged by Pacific Finance Corporation of California, the undersigned, Pacific Finance Corporation of California has sold, assigned, transferred, set over, and forever *308 released, and by these presents, does hereby sell, assign, transfer, set over, and forever release, unto said Vanguard Films, Inc., its successors or assigns, all the right, tile, and interest, if any, of the undersigned, of every kind and nature, in and to (a) the said feature motion picture photoplay entitled 'REBECCA' and/or (b) all negatives, dupe negatives and positive prints of said photoplay, and/or (c) the copyright of said photoplay, including, without limiting the generality of the foregoing, all the right, title, and interest acquired by the undersigned under and pursuant to said Bill of Sale and Agreement, in and to all the rent, revenue, income, compensation and profits of the said photoplay, and the right to receive payments from the distributor or distributors of such photoplay. "IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed and acknowledged by its proper officers thereunto duly authorized, this 2nd day of January, 1946." "PACIFIC FINANCE CORPORATION OF CALIFORNIA" "(seal)" "By A. M. DeLauney" / "Vice President" "ATTEST:" "B. C. Reynolds" / "Secretary" Vanguard Films, Inc., came to petitioner and offered to purchase its remaining *309 interest in the film. Petitioner was willing to sell its interest to Vanguard Films, Inc., for the sum of $174,776.76 and the sale resulted. On January 3, 1946, petitioner received the sum of $174,776.76, which was recorded on a journal voucher as follows: "To record profit realized on the sale of our interest in revenues from exhibition of the photoplay Rebecca. Original Cost, Dec. 22, 1943
$450,000.00
Less Payments rec'd to 12/31/45
375,223.24
Net Investment 1/3/46
$ 74,776.76
Selling Price 1/3/46
174,776.76
Profit as above
$100,000.00" At that time there was only a small amount of money, approximately $2,800, which had been earned by United Artists and which, being in transit, had not yet been received. This amount, received by petitioner after the sale, was returned by it. On its Federal income tax return for 1946 petitioner reported the sum of $100,000 as a long-term capital gain under section 117 of the Internal Revenue Code. In the deficiency notice herein respondent taxed the amount of $100,000 as ordinary income under section 22(a) of the Internal Revenue Code. Petitioner, during the taxable year *310 1946, was engaged in the business of "Installment sales financing, personal loans and insurance." During 1946 it and its affiliated corporations received the total amount of $4,484,552.29 from "Interest on loans, notes and mortgages." About 80 to 85 per cent of its total business was automobile financing. On November 10, 1943, petitioner made an outright loan of the sum of $500,000 to Vanguard Films, Inc., which company was stated to have been owned by David O. Selznick, which loan was in the nature of a "second money" production loan on a motion picture entitled "Since You Went Away." This loan bore interest at the rate of 8 per cent per annum, and also provided that petitioner should have, in addition, a participating interest of 10 per cent of Vanguard's net profit arising out of such motion picture. Copies of petitioner's annual reports for the calendar years 1943, 1944, and 1945 show that petitioner, during those years and particularly during 1944 and 1945, did considerable business with respect to the purchase and collection of accounts receivable. The 1943 annual report shows among other assets, and separate and apart from "Investments," an item of "Other Receivables, *311 $168,775.80." The 1944 annual report lists among assets under the general caption of "Loans and Discounts," an item of "Purchased accounts receivable, $445,965.98." This report also lists among "Loans and Discounts Outstanding," an item of "Purchased accounts receivable" amounting to $186,989.39 at the end of 1943, and $445,965.98 at the end of 1944. Petitioner's annual report for 1945, under the schedule of assets and the heading "Loans and Discounts," listed an item of Purchased Accounts Receivable of $672,767.29." This report, under caption "Loans and Discounts Acquired," listed a similar item of "Purchased accounts receivable" in the amount of $5,009,088.31 at the end of 1945, and $6,683,807.13 at the end of 1944. Petitioner, prior to and at the commencement of the taxable year 1946, was doing a large amount of business in the purchasing and collection of accounts receivable. The purchasing and collection of accounts receivable constituted a part of its regular business during the years 1943, 1944, and 1945, and such business continued into 1946. Petitioner did "Accounts receivable financing" as a part of its usual business, and it would sometimes make a loan of money in *312 connection with such transactions. The profit of $100,000 which petitioner received on the sale of its interest in the photoplay "Rebecca" constituted a long-term capital gain and not ordinary income. Opinion The relationship of petitioner to this enterprise was clearly not that of lender as respondent primarily contends. There was no obligation to repay and if nothing had been earned, nothing would have been received. There is accordingly no analogy to interest or the payment made for the use or forbearance of money and we see no basis for treatment as ordinary income on this ground. There may be more plausibility to respondent's casual suggestion that the arrangement was in reality a joint venture. If so, the problem would not ordinarily be solved by the mere assumption reiterated by petitioner that its interest in the venture was a capital asset. Capital assets can be productive of earnings. Earnings are subject to treatment as ordinary income if received. And the fact that they are disposed of in advance of receipt would not prevent their taxation as ordinary income rather than capital gain. Hort v. Commissioner, 313 U.S. 28; see Bull v. United States, 295 U.S. 247. *313 But if in the present case the arrangement was a joint venture, no immediately apparent construction would justify the deficiency. If on the one hand petitioner was entitled to the current earnings of the venture and they should have been treated as ordinary income when earned whether distributable or not, all but an insignificant sum was taxable in years prior to the one now before us. On that approach, petitioner would actually have sustained a capital loss in the present year on its disposition of the interest it held in the venture, George R. McClellan, 42 B.T.A. 124, affirmed (C.A. 2), 117 Fed. (2d) 988, for which, however, it makes no claim. To the contrary, and perhaps for that reason, respondent makes no effort to treat as taxable any more than the excess over petitioner's basis. Since, at the time of the sale, petitioner had not yet recovered its original investment, it is accordingly a logical contradiction to suggest that there were in addition divisible earnings to which petitioner was also and simultaneously entitled. Only the hope of future earnings from the investment was as yet a reality. We hence find it unnecessary to explore here the *314 complex field of partnership tax law involving the taxability to a selling partner of his share of earned but undistributed partnership income. Cf. Helvering v. Heber Smith (C.A. 2), 90 Fed. (2d) 590; Richard S. Doyle, 37 B.T.A. 323, affirmed (C.A. 4), 102 Fed. (2d) 86; Louis Karsch, 8 T.C. 1327 with Swiren v. Commissioner (C.A. 7), 183 Fed. (2d) 656, certiorari denied, 340 U.S. 912. See also Bull v. United States, supra; and cf. Stilgenbaur v. United States (C.A. 9), 115 Fed. (2d) 283. Since the parties apparently agree that at the time petitioner sold its interest there were no earnings, it follows that the entire amount received was capital gain. Decision will be entered under Rule 50.