**AYRTON METAL COMPANY, Inc.,**
Petitioner-Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 58, Docket 26903.

United States Court of Appeals
Second Circuit.

Argued Nov. 9, 1961.

Decided Feb. 1, 1962.

Joseph W. Burns, New York City (John P. Cuddahy, Simon Gluckman, and Austin, Burns, Appell & Smith, New York City, on the brief), for petitioner-appellant.

Harold M. Seidel, Attorney, Department of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Meyer Rothwacks, Robert N. Anderson and Robert Layton, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent-appellee.

Before LUMBARD, Chief Judge, and MEDINA and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

The sole questions in the case are whether two payments of $26,000 and $40,000, or parts thereof, constitute capital gains realized by the taxpayer or, as held below, ordinary income. The decision of the Tax Court is reported at 34 T.C. 464. Our jurisdiction is properly invoked under Section 7482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7482.

Respondent argues in substance that the transactions involved are complex,

that the findings depend upon the demeanor and credibility of witnesses, and that the case involves "no substantial questions of law," but only issues of fact "which the Tax Court had the best opportunity to analyze." We have concluded, however, after a careful study of the trial transcript and all the exhibits, as well as the briefs submitted, that there is no substantial issue of veracity in the case, that the acts and also the intent of the parties clearly appear from the numerous documents received into evidence, and the seeming complexity of the case is the result of a misconception on the part of the Tax Court of what appears on the face of the documents in the light of certain undisputed facts. We find the payment of $26,000 on January 24, 1950 to be a share of the profits of the joint venture as the parties treated it as such, and hence, with respect to this payment, we affirm the decision of the Tax Court holding this payment to be ordinary income. But we reverse the determination of the Tax Court with respect to the $40,000 paid on December 19, 1951, and hold this payment to constitute a capital gain as it did not represent a sharing of profits, but rather an amount paid for the transfer by the taxpayer of its interest in the joint venture, a capital asset.

■ Certain preliminary observations will, we think, tend to clarify the ensuing statement of facts and discussion. The principal documents relating to the two payments were not prepared by the taxpayer and there is convincing internal evidence that, *mirabile dictu*, there was no attempt by the taxpayer or anyone else to color these transactions so as to make them fall into the category of capital gains. In other words, the documents reflect the genuine agreements entered into by the joint venturers when the relationship between the parties was terminated. We agree with the Tax Court that the relationship between the participants was, so far as the tax laws are concerned, substantially that of partners. Internal Revenue Code of 1939, Section 3797(a) (2), 26 U.S.C.A. § 3797 (a) (2); see Rogers v. Commissioner,

3 Cir., 1950, 180 F.2d 720; Beck Chemical Equipment Corp., 27 T.C. 840 (1957). This is true even though the terms of the agreement setting up the joint account were informal and oral. Nor is it of any significance tax-wise that no articles of partnership or tax returns were filed for the joint account.

### The Joint Venture

Ayrton Metal Company, Inc., the taxpayer and petitioner herein, a New York corporation, had its principal place of business in New York City. Its affairs were managed by Richard Ayrton and Heinrich Meyer, its president and vice-president; and Richard Ayrton's brother, Samuel Ayrton, operated a metal trading business in London. It is not disputed that whenever Samuel Ayrton or members of his London staff participated in the events about to be described he was duly authorized to act for the taxpayer. We shall accordingly refer generally to Ayrton, unless the context makes it necessary or desirable to give the names of individuals. The other member of the joint venture was Metal Traders, Inc., hereinafter referred to as Metal Traders, also a New York corporation, and a wholly owned subsidiary of Metal Traders, Ltd., of London. Metal Traders was one of the world's largest dealers in antimony ore. Both Ayrton and Metal Traders are shown by the record in this case to be firms of wide experience in the operation of mines and the purchase and sale of and trading in metals. The men who managed these concerns were keen business men and skillful and resourceful bargainers, as they doubtless had to be if they were to retain any capital with which to bargain in a field so alluring and so competitive.

The Churquini Mine, near Atocha, Bolivia, produced antimony ore. It had formerly been owned by Santiago Wright and upon his death it was known as the Empresa Minera Sucesion Santiago Wright, and it was inherited by his sister, Mrs. Theodosia Monson, a resident of London. James Bennett was Mrs. Monson's representative in London, and

he in turn was a friend of Samuel Ayrton. When Samuel Ayrton learned that Mrs. Monson was having trouble with the mine and was not getting any income from it, he discussed the matter with his brother in New York. The upshot was that Richard Ayrton brought the business to Metal Traders, and in October, 1947 the oral agreement was made establishing the joint venture. What Ayrton had was its own expertise and its close relationship with Bennett, and, through Bennett, with Mrs. Monson; Metal Traders had a representative in La Paz, Bolivia, was familiar with mining conditions in Bolivia and was willing to make the advances necessary to the operation of the mine. It was agreed that profits and losses would be shared equally, that the ore would be bought and sold only on mutually satisfactory terms, that Metal Traders would supervise the mine and supply all the capital necessary for buying the ore, that Ayrton would negotiate with Mrs. Monson for the purchase of the ore, and that Metal Traders would manage the joint account and arrange for sales of the ore. The joint account related only to the Churquini Mine.

As it turned out, three contracts were made with Mrs. Monson. Respondent urges us to hold that each of these was a "separate transaction," i. e., a separate joint venture. At least that is the way we read the Government brief. We disagree. The joint venture came into existence at the time of the oral agreement in October, 1947; it was to exist as long as the joint venturers were able to enter into contractual relations with the owner of the mine; it was concerned not only with the first contract with Mrs. Monson, but also with "future contracts." It was a single, unified joint venture, not a series of separate and disconnected joint accounts. And the joint venture continued to exist until it was terminated by mutual consent, a subject to which we shall return.

It is not clear to us that the Tax Court intended to make a finding supporting the respondent's contention that there were three separate joint ventures. Assuming that such a finding was intended, we set it aside as clearly erroneous. There was, as we have just pointed out, a single joint venture, not three separate joint ventures. The interest of Ayrton was not solely in the profits or losses arising out of the operations conducted in connection with the three contracts with Mrs. Monson. Ayrton also had an interest in the joint venture itself, an interest that included, as we shall see, the right to participate in future dealings with Mrs. Monson for the purchase of ore, and further to participate in any purchase of the mine itself.

While little or nothing is said on the subject in the opinion of the Tax Court, the cables and correspondence between the various interested parties prior to the execution of the first contract with Mrs. Monson clearly indicate that the joint venturers were, from the outset of the relationship, concerned with an option to purchase the mine and with the possibility of ultimate purchase.

Probably to support respondent's argument, to the effect that the $40,000 payment was in the nature of a finder's fee, respondent consistently plays down the participation of Ayrton in the operation of the joint venture. But the numerous documents in evidence demonstrate clearly and convincingly that Ayrton did much more than negotiate the various contracts with Mrs. Monson. There were problems concerning the formulation of the terms of the option to purchase the mine, the selection of a trustworthy and efficient superintendent at the mine, foreign exchange, labor troubles affecting production, the amounts of money to be advanced both for Mrs. Monson's personal use and for the operation of the mine and the repayment of these advances. In all these matters Ayrton participated in a far from perfunctory manner, and most of the sales made by the joint venture were made after mutual consultation and agreement between Ayrton and Metal Traders. The $40,000 was no finder's fee.

The first contract with Mrs. Monson was in effect from January 1 to September 30, 1948. It provided for the purchase of the mine's production and included an option to purchase the mine for 40,000 pounds sterling. The terms of this option were set forth in great detail. The result of operations under the first contract was a profit, and on July 7, 1949 Metal Traders sent Ayrton its check for $18,532.04 as Ayrton's share of this profit. Ayrton accounted for this to the tax authorities as ordinary income, which it clearly was, and the tax was paid on this basis.

The second contract with Mrs. Monson began on October 1, 1948 and continued through December 31, 1949. It also provided for the purchase of the output of the mine, and the option to purchase the mine for 40,000 pounds sterling was extended to December 31, 1949.

Before the expiration of the second contract, and while the operations of the joint venture under the second contract were continuing, the third contract with Mrs. Monson was made on November 3, 1949. This contract was in marked contrast to the two previous ones. The price of antimony ore had dropped. It would have been contrary to the interests of the joint venturers, under these circumstances, to continue the option to purchase at 40,000 pounds sterling, and the option was not mentioned in the third contract. Moreover, instead of purchasing the output of the mine, the joint venturers agreed upon the purchase of only 360 tons of antimony ore, to be shipped from January 1950 through April 1950. The price was only $2.50 per unit, about 37½% less than the purchase price per unit prescribed in the prior contracts.

This brings us to the critical phase of the case.

### The First Dispute

Trouble started in November, 1949, shortly after the signing of the third contract with Mrs. Monson. About six months earlier, with the mutual assent of the two joint venturers, a contract had been made to sell to the Japanese Ministry of International Trade and Industry 783 tons of antimony ore at $4.99 per unit. The documents show clearly that this entire contract was for the joint account. It developed, however, that Metal Traders had delivered 419.623 tons to the Japanese from its own stocks, because Churquini production was not available on the date fixed for delivery, and Metal Traders proposed to handle these 419.623 tons for its own account. When Ayrton was informed of this it protested. The reason for this was that Ayrton had expected the Japanese contract to take care of the balance of the production of the mine for the duration of the second contract, and on this basis the price of $4.99 per unit would have shown a nice profit. If, on the other hand, there was to remain in inventory 419.623 tons, no one could tell what the loss might be if the market price continued to go down. Ayrton's position in this dispute is expressed in various ways in the correspondence: Metal Traders had no right to deliver part of the Japanese shipment for its own account; Metal Traders should account to the joint venture for the total tonnage produced at the mine during the balance of the second contract at $4.99 per unit, "irrespective whether the material was shipped or not against the [Japanese] contract"; as far as any excess quantity is concerned "we [Ayrton] have to negotiate with you as to how this excess quantity should be settled"; as regards the third contract, "we [Ayrton] should be in to the bitter end." The position of Metal Traders at the outset of this first dispute was that "the sale to Japan has been a subject of the Joint Account only as far as the Churquini production is concerned."

The first offer of settlement by Metal Traders is contained in a letter to Ayrton of November 21, 1949. It says nothing about the termination of the joint venture. The offer is to account for so much of the Churquini production as was delivered to Japan at $4.99 per unit, to consider the Churquini production against the second contract that was not de-

livered to Japan as entirely for its own account, and "we shall take the corresponding loss for our account." And, as to the third contract Metal Traders proposes to give Ayrton the option to be released from its engagement in the joint venture under the third contract. Finally, if Ayrton does not wish to be released, "then we [Metal Traders] wish you to understand that any Antimony Ore sales which we might make will be for Joint Account only as far as deliveries of the Churquini production are concerned." This offer was rejected by Ayrton.

The second offer by Metal Traders was made at a conference between representatives of the disputants at a restaurant on December 28, 1949. What occurred is described by Heinrich Meyer in a letter of December 29, 1949, received in evidence as Exhibit 55. It is the misconstruction of this letter, or the effect accorded to it by the Tax Court in arriving at its findings, that had much to do with the erroneous conclusion that the $40,000 payment was ordinary income. The entire letter is quoted in the margin.[1]

1. "Letter No. 1160
December 29, 1949.
"Ayrton Metals Ltd.,
10/13 Dominion Street,
London, E.C.2.

"Dear Sirs: Re: CHURQUINI

"I had a meeting yesterday with Metal Traders. Mr. Carberry, Friedlander and Dwyer were present. My impression was that all three of them are pretty sore at us because of the controversy we have on this joint account. However, I feel that after I had lunch with them and left them our old friendly relations were restored. Before I went into all the particulars with them I ascertained the production figures for November and December. The latest advice they had from Aigner was that the November production was 179 tons out of which Philipp Bros. got 20 tons so that there were 159 tons left for M.T. The December production will be at least the same figure. M.T. are, of course, not very pleased with it and have informed Aigner of their displeasure but they cannot do anything against it because it shows on the other hand the good management of Mr. Aigner. These figures will bring the over-all production for 1949 up to about 1390 tons plus 440 tons for Philipp Bros. M.T. actually delivered only to Campine 360 tons out of the 1949 production and 420 tons to Japan and 40 tons to Grace which is a total of 820 tons. Therefore they have an unsold balance for 1949 of about 570 tons.

"For more than an hour we argued back and forth and it was leading to nothing, because they maintained their standpoint and I did not budge from mine which was outlined in my letter to them of November 14th. Finally I reminded them that so far any joint account which our company has done with them was always brought to them by us. I mentioned the Maganese and the Churquini contract and several other small things and that I am still waiting for the day where I shall receive a proposition from them which would be interesting to us and would give us some profits which would compare with what we brought to them.

"Mr. Friedlander pointed out then to me that they are, in principle, against any joint account and he reminded me of the conversation R.A. and I had at the Ritz Carlton in New York with Frank Baer at the time when the first contract was negotiated with Churquini. At that time Mr. Baer mentioned to Friedlander how he could do any joint account with us in a commodity in which he is running his own book and Mr. Baer mentioned that such a joint account must lead to trouble even if he is doing it with his best friends. Friedlander replied at that time that this may be true with everyone except Ayrton Metal Co. Now he received a few days ago a private letter from Frank Baer reminding him of this conversation and Mr. Baer also reminded him how right he was. Therefore, they have decided not to do any joint accounts any more in the future in commodities for which they have to run their own book. It is therefore their desire to terminate with us their joint account in Churquini and they proposed to us to pay us the round sum of $26,000 for the second contract. They have calculated this sum as follows:

"360 tons to Campine pus 40 tons to Grace makes 400 tons at a cost price of $4 per unit. f.o.b. Antofagasta; sales price $5.40 f.o.b. Antofagasta equal to $1.40 profit on basis of 60% equals $33,-600. 780 tons sold to Japan at a cost price of $4 f.o.b. Antofagasta and sales price of $4.40 f.o.b. Antofagasta which is 40¢ per unit profit equal to $18,720. They figure the costs for freight and

While this second offer of Metal Traders was rejected, despite Meyer's recommendation that it be accepted, it is interesting to note that Metal Traders is now suggesting a payment of $26,000 to get Ayrton out of the joint account. This would indeed have been a shrewd piece of work had it succeeded. The price of antimony ore was greatly depressed, the new supervisor at the mine, Walter Aigner, was not only proving himself to be an astute and intelligent administrator, but he may well have been accomplishing more in the way of production than Ayrton was aware of. Moreover, it was apparent that Ayrton was fearful of sustaining a heavy loss. If this offer had been accepted, Ayrton would have been out of the joint venture, and the terms of the offer meant that Metal Traders would have been free to negotiate directly for future purchases of ore, "without reserving us [Ayrton] any interest in such a deal."

After further negotiations and various counter-offers by Ayrton, the dispute was settled on January 24, 1950. The two documents evidencing the settlement, Exhibits 58 and 59, were executed simul-

insurance from Antofagasta to Antwerp at around 35¢ per unit and from Antofagasta to Japan around 50¢ per unit. Therefore they propose to pay us approximately half of the above amount which is equal to $26,000.

"They made this proposition under the condition that they take over everything which is left unsold from Churquini for 1949 and that they also take over the 360 tons which we recently bought @ $2.50 f.o.b. mines for delivery up to April 1950. We have not to participate in any charges for anything and in no losses and profits for the third contract. We have also nothing to do with any commissions they have to pay or any charges which may occur. In other words in paying us $26,000 in a round sum we are out of the Churquini joint account. Furthermore, they made it clear that if and when a fourth contract is negotiated with Churquini they would negotiate with Aigner directly without reserving us any interest in such a deal.

"I just listened to their proposition without making any comments. The only comment I made was that if we would come to any agreement it should be very clear to them that from then on we would be their competitor for Churquini and that we will, of course, then try to buy the ore for our own account without giving them any interest. In other words that everybody can do what they like. This was practically the end of the conversation and I only mentioned that I would transfer their proposition to you and that I will leave the decision to you to accept it or not. Metal Traders would like to have my reply by latest January 5th.

"My personal opinion is to accept the $26,000 and their additional proposition because the whole matter is now on a very unpleasant basis and after all it would not be a bad settlement considering that this settlement provides for the whole Japanese sale as done for the joint account which was, as you will remember, our main argument. It will also relieve us from probable losses which we should certainly avoid if possible. Mr. Friedlander has shown me a contract which he made with a Bolivian mine on November 25, 1949 for 300 tons 60% Sb and maximum 0.5% lead plus arsenic @ $2 per long ton unit f. o. b. mines which shows you that the third contract from Churquini is not a bargain. I have seen the original contract. You also see from the offer from Grace today how even very clean and high grade ore is offered today. While it is quite possible that the market for antimony ore may improve for 1950, we still have a chance because of your connection with Bennett to bid ourselves on the fourth contract under better conditions than they are right now. Of course, I understand your difficulties how to explain to Bennett at that time why we are not interested in doing the contract again with Metal Traders and why M.T. may bid directly without us. However I think that you will find some explanation for it if the question comes up. Please send me an Imco on receipt of this letter after you have discussed the matter with R.A. to whom I have send [sic] today a copy of this letter.

"Very truly yours,

AYRTON METAL COMPANY, INC.

H. Meyer, Vice President

"HM:lr

cc. Surface Mail

Mr. Richard Ayrton"

Note: Friedlander, referred to in the above letter, was vice-president of Metal Traders.

taneously and the $26,000 paid. These two letters are as follows:

"January 24, 1950
"Ayrton Metal Co., Inc.
30 Rockefeller Plaza
New York 20, N. Y.
"Attention of Mr. H. Meyer:
"Gentlemen:

"We refer to our recent discussions regarding the Churquini Joint Account business in Antimony Ore and now confirm the understanding whereby we shall pay you a sum of $26,000.00 in full and final settlement of all your interests in the Churquini Second and Third Contracts.

"We enclose our Credit Note No. 23143 in the amount of $26,000.00 and shall be obliged if you will kindly indicate your conformity with the foregoing understanding by signing and returning the duplicate copy of this letter.

"Yours very truly,
Metal Traders, Inc."

"January 24, 1950
"Ayrton Metal Co., Inc.
30 Rockefeller Plaza
New York 20, N. Y.
"Attention of Mr. H. Meyer:
"Gentlemen:

"This will confirm the arrangement whereby we will pay you a commission on all Antimony Ore purchased by us from Churquini subsequent to the Third Contract. The commission is to be fixed by us from time to time in accordance with the profit realized on each purchase but in no event shall the rate be less than 2% of the contract purchase price.

"This arrangement will continue so long as the Churquini Mine remains in its present ownership, i. e., Mrs. Theodosia Monson, but may be subject to revision or termination at any time by mutual agreement.

"We shall be obliged if you will kindly indicate your conformity with the foregoing by signing and returning the duplicate copy of this letter.

"Yours very truly,
Metal Traders, Inc."

Edmund J. Dwyer, the Secretary and Treasurer of Metal Traders and a certified public accountant testified that he drafted the letters and that when he used the expression "your interests in the Churquini second and third contracts" he had in mind only the agreement with respect to sharing profits and losses.

That there were two separate documents was no mere accident. The two phases of the settlement made by the parties were separate and distinct, and represented two quite separate steps in the understanding pursuant to which the relationship of the parties as joint venturers was terminated. The first document reflects what the parties had agreed would amount to Ayrton's distributive share of the profits under the second and third contracts, i. e., $26,000. The second document reflects what the parties had agreed would be paid for the sale of a partnership interest. Far from being complicated, the case is just as simple as that.

And the testimony of Friedlander, quoted in the opinion of the Tax Court, confirms the view we have just expressed. This testimony is:

"Q. As a result of these discussions, was not an agreement made by which Metal Traders would pay $26,000 plus two percent, at least two percent on purchases? A. They were two completely distinct things. Firstly, there was $26,000, which was paid in lieu of the profit out of the second and third contracts; secondly, we committed ourselves to pay a minimum two percent commission; more if the business would stand it, and that was in lieu of their continuing the joint account."

The net result is that Ayrton receives $26,000, an amount the parties determined after due bargaining represented a fair approximation of the share of the profits Ayrton was entitled to because of its interest in one-half the profits under the second and third contracts. The net result also is that Ayrton's other rights in the joint venture have been sold and transferred to Metal Traders, and the price to be paid for these other, separate, rights is to be a "commission" on all

antimony ore purchased by Metal Traders from the Churquini mine after the deliveries under the third contract had been completed, this "commission" to be fixed by Metal Traders "from time to time in accordance with the profit realized on each purchase but in no event shall the rate be less than 2% of the contract purchase price." The capital asset thus disposed of included Ayrton's right to participate in future contracts for the purchase of antimony ore from the Churquini mine, as long as the mine remained in the ownership of Mrs. Monson, and also the right to participate in the benefits to be derived from the purchase of the mine from Mrs. Monson. This makes sense. Moreover, Ayrton's rights to participate in future contracts for the purchase of Churquini ore from Mrs. Monson, and to participate in benefits derived from the purchase of the mine, were inherent in the relationship between Ayrton and Metal Traders. It was not necessary to spell them out, in the documents or otherwise.

Under the interpretation of the joint venture tendered by the Government, and perhaps as intended in a roundabout way by the Tax Court, Metal Traders would have been free to freeze Ayrton out and for its own account alone make new contracts with Mrs. Monson, if it could, not only for the purchase of additional quantities of ore but for the purchase of the mine itself. We have already set any such finding aside as clearly erroneous. Even Friedlander admitted Metal Traders had no right to freeze Ayrton out. Moreover, in view of the close personal relationship between James Bennett and Samuel Ayrton, it would have been impossible as a practical matter for Metal Traders to count Ayrton out of future contracts for the purchase of Churquini ore. It may well be that Ayrton was not on January 24, 1950 conscious of the fact that Metal Traders might buy the mine from Mrs. Monson. But this is irrelevant. Ayrton sold and transferred to Metal Traders whatever rights and interests it had in the joint venture, other than the right to profits under the second

and third contracts, and one of these rights, in addition to its right to participate in future contracts with Mrs. Monson, was the right to require its partner to hold for the benefit of the joint account any asset, such as the mine, purchased by its partner in violation of the partner's fiduciary duties. Meinhard v. Salmon, 1928, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1. This interest in the joint venture is clearly a capital asset. See Rogers v. Commissioner, 3 Cir., 1950, 180 F.2d 720; United States v. Landreth, 5 Cir., 1947, 164 F.2d 340; United States v. Adamson, 9 Cir., 1947, 161 F.2d 942; G. C. M. 26379, 1950–1 Cum.Bull. 58. Compare Berry v. United States, 6 Cir., 1959, 267 F.2d 298, with Leff v. Commissioner, 2 Cir., 1956, 235 F.2d 439. Compare Internal Revenue Code of 1954, Section 741, not applicable in this case. This case, as above indicated, is governed by the Internal Revenue Code of 1939.

■ The Tax Court put misplaced reliance upon the fact that "the payments were based on and measured by the purchase and sale of ore in the conduct of an ore selling business." The fact that payment for a capital asset is measured in terms of income or profits does not necessarily change the payments into ordinary income. See Burnet v. Logan, 1931, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143; Williams v. McGowan, 2 Cir., 1945, 152 F.2d 570, 572, 162 A.L.R. 1036; Helvering v. Smith, 2 Cir., 1937, 90 F.2d 590; Hill v. Commissioner, 1 Cir., 1930, 38 F.2d 165, cert. denied, 281 U.S. 761, 50 S.Ct. 460, 74 L.Ed. 1170; Estate of Raymond T. Marshall, 20 T.C. 979 (1953). As a matter of fact, how else could the value of Ayrton's interest in the joint venture be sensibly computed? The price of antimony had fallen, and it was uncertain whether or not any future purchases from the Churquini mine would be made, and if made, whether or not they would be profitable. To pay Ayrton "in accordance with the profit realized" is a most reasonable way to fix an amount to be paid for Ayrton's interest in the joint venture. The provision that 2% of the contract purchase price of any pur-

chases was to be the minimum payment does not change the basic character of these payments to that of ordinary income. Nor is the fact that these payments were referred to as a "commission" persuasive, see Nordberg Mfg. Co. v. Kuhl, 7 Cir., 1948, 166 F.2d 331; Estate of Raymond T. Marshall, supra; George James Nicholson, 3 T.C. 596 (1944), that term merely served as a convenient label to describe the payments.

For some reason we are at a loss to understand, the Tax Court fixed the date of termination of the joint venture at April 30, 1950, the terminal date of the third contract. We are required to and we do set this finding aside as clearly erroneous, since the joint venture was at an end upon the delivery of the documents and the check for $26,000 on January 24, 1950. All that remained was the payment of the amounts agreed to be paid to Ayrton for the sale and transfer of its interest in the joint venture, other than its interest in the profits arising out of the second and third contracts that had already been paid for.

■ What is the proper tax treatment of the $26,000 received "in lieu of the profit out of the second and third contracts"? The answer turns on the nature of the consideration exchanged for the $26,000; to the extent that the money was paid for a capital asset it may be treated as capital gain. And authorities seem to support the proposition that a right to future, uncertain profits may be considered to be a capital asset. See Pat O'Brien, 25 T.C. 376 (1955); Pacific Finance Corp. of Calif., 12 T.C.M. 419 (1953). Compare Hort v. Commissioner, 1941, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168; Doyle v. Commissioner, 4 Cir., 1945, 147 F.2d 769; Bessie Lasky, 22 T.C. 13 (1954). See generally Vol. 3B Mertens, Federal Income Tax § 22.36 (1958).

■ Ayrton's transferred interest in both these contracts was the right to share in the profits and losses thereunder. To the extent to which the $26,000 rep-resented payment for Ayrton's interest in the third contract it might well have been capital gain. On January 24, 1950 the amount of profits from the third contract, if any, was at best uncertain. However, it is clear that the parties considered the right to share in profits under the third contract to be of negligible value. In its brief, Ayrton asserts that "it was pure speculation whether it [the third contract] would result in a profit or a loss." It was Meyer's opinion on December 29, 1949, that "the third contract from Churquini is not a bargain." Furthermore, by January 24, 1950 the market price of antimony ore appears to have fallen below the contract purchase price. See Petitioner's Exhibit 75. Ayrton feared a loss under the third contract and was glad to get out of it. Release of liability for this anticipated loss would seem to provide the *quid pro quo* for the foregoing of any right to a share of what appeared to be improbable profits. In any event, that part of the $26,000, if any, paid for Ayrton's interest in the third contract was so slight that we would not be warranted in remanding the case for the purpose of making an apportionment of the $26,000, and allocating a portion thereof to capital gain.

Our task thus is narrowed down to determining what was Ayrton's interest in the second contract. To the extent that it represented future, uncertain profits it might have been a capital asset. However, the $26,000 was not paid, to any extent, for such future profits. Ayrton's position had been that Metal Traders should treat the 419.623 tons shipped to Japan from Metal Traders' own stock as coming from the joint account. This amount is exactly equal to the joint account's unsold inventory on January 24, 1950. Thus, if Ayrton's view was accepted, its share of the profits under the second contract could have been ascertained by a simple arithmetic computation. The total gross profits would be $56,513.58 and Ayrton's share $28,256.79. $26,000 would not be an unreasonable compromise for this claim, considering the as yet unaccounted for

finance charges and the desirability of disposing of the dispute by adjustment.

True, if Ayrton's contention as above stated was rejected, a one-half interest in the second contract would, at most, be worth only $2,642.72, since the market value of the ore still in inventory had fallen to $55,130.07. But Ayrton while pointing to this low figure of $2,642.72 and arguing that, therefore, the $26,000 could not be deemed to represent its share of the profits under the second contract, makes no mention of the obvious fact that, if its contention be accepted, its share of the profits of the joint account would have been in excess of $28,000, as, upon this hypothesis, there would have been no unsold inventory. Moreover, the alternative suggested by Ayrton, that the $26,000 was part of the consideration for its total interest in the joint venture is clearly contrary to the testimony and the documents above discussed.

The mere fact that there was a dispute between the parties over the amount of profits under the second contract, and this dispute was settled by agreeing on the figure of $26,000, does not change the nature of that payment from what it was—a distribution of profits, nor does the fact that there was such a dispute compel the conclusion that there could have been no profits. Cases such as Berry v. United States, supra, urged upon us by Ayrton, and Leff v. Commissioner, supra, urged upon us by the Commissioner, are clearly inapplicable to the payment of $26,000 as they deal with the sale of a partnership interest, and not the settlement of a dispute regarding a divi-sion of profits. Compare B. Howard Spicker, 26 T.C. 91 (1956).

### The Second Dispute

What we have already said disposes of the major problems of the case. However, the proper treatment of the $40,000 payment, made in settlement of the "commission" agreement, requires further consideration.

After Metal Traders purchased the mine from Mrs. Monson on November 28, 1950, there could be no further accrual of moneys payable to Ayrton under the "commission" agreement, as the terms of this second agreement of January 24, 1950 specified that the arrangement was to be in effect only so long as Mrs. Monson continued to own the mine. A dispute arose between Ayrton and Metal Traders about the amount to be paid as "commission," no payments on account of or in liquidation of this obligation having yet been made.

While Ayrton never did succeed in seeing the books of Metal Traders, the purchases of ore after April 30, 1950 and before the sale of the mine amounted to something in the nature of one million dollars, according to Friedlander's testimony. Ayrton started asking for $75,000, claiming that the ore purchases had been very profitable. Even if he was just "fishing," as Friedlander claimed, Ayrton probably never suspected the figure was as high as Friedlander testified it was, and it may well have been higher. In any event, the parties finally agreed upon $40,000, and the final agreement, dated December 19, 1951, pursuant to the terms of which this payment was made is set forth in the margin.[2]

2. "December 19, 1951

"Ayrton Metal Co., Inc.
30 Rockefeller Plaza
New York 20, N. Y.

"Attention of Mr. H. Meyer:

"Gentlemen:

"On January 24, 1950 it was agreed between Ayrton Metal Company, Inc. (hereinafter called 'Ayrton') and Metal Traders, Inc. (hereinafter called 'Metal Traders') that Ayrton would assign to Metal Traders its interest in the joint venture marketing arrangement for the output of the Churquini Mine in consideration of:

"(1) A payment of Twenty Six Thousand Dollars ($26,000.00) in full and final settlement of Ayrton's interest in the Churquini second and third contracts; plus

"(2) At least two percent (2%) of the contract purchase price of all Ore purchased by Metal Traders from the Churquini Mine subsequent to the third contract, under an ar--

*Ordinarily,* the "fair market value" on January 24, 1950 of the promise to pay the "commission" would have been reported as capital gain in Ayrton's fiscal year in which it was received, i. e., the year ending August 31, 1950. Internal Revenue Code of 1939, Sections 111, 117, 26 U.S.C.A. §§ 111, 117; Estate of Marsack v. Commissioner, 7 Cir., 1961, 288 F.2d 533. The entire fair market value would have been gain since apparently Ayrton's basis for its joint venture interest was zero. When, in its fiscal year ending August 31, 1952 Ayrton received the $40,000 in settlement of its claim under the "commission" agreement, it would have been required to recognize gain or loss to the extent that the $40,000 was more or less than its basis for that contract right. Internal Revenue Code of 1939, Section 111; see Arrowsmith v. Commissioner, 1952, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6; Commissioner v. Pittston Company, 2 Cir., 1958, 252 F.2d 344, cert. denied, 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364; Hatch v. Commissioner, 2 Cir., 1951, 190 F.2d 254. These problems, however, do not arise in the peculiar circumstances of this case.

In rare circumstances, a contract right received in a sale or exchange does not have an ascertainable fair market value at the time it is received, and special treatment is necessary. Gain or loss cannot be computed at the time of the sale or exchange, so the transaction is not considered closed. Burnet v. Logan, 1931, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143; Commissioner v. Carter, 2 Cir., 1948, 170 F.2d 911; George W. Potter, 7 T.C.M. 622 (1948). As the case before us is one requiring such special treatment, the capital gain should have been recognized as the "commission" payments were made.

That Ayrton's contract rights under the "commission" agreement had no ascertainable fair market value on January 24, 1950 is obvious, since the value of such rights depended upon a series of contingencies of such a character as to make any estimate of fair market value sheer surmise and speculation. On that date Metal Traders had no contract for purchases from the Churquini mine which would have required payments to Ayrton. Metal Traders was completely free not even to attempt to make such purchases. Indeed, Mrs. Monson might have preferred to sell to others. The life of the agreement was contingent upon Mrs. Monson's continued possession of the Churquini mine, a contingency neither party could control. Even the ability of the mine to continue to produce

rangment which would continue in force so long as the Churquini Mine remained in the ownership of Mrs. Theodosia Monson.

"Subsequent to making the aforesaid Agreement, Metal Traders entered negotiations with Mrs. Monson to purchase the Churquini Mine and the negotiations were concluded on November 28, 1950, on which date Metal Traders acquired ownership of the properties.

"During the period January 24, 1950 to November 28, 1950, Metal Traders purchased 1,040 tons of Antimony Ore from the Churquini Mine. These purchases were subject to payment to you of at least 2% of the contract purchase price in accordance with the Agreement made on January 24, 1950. We offered to pay you 2% of the contract purchase price on the aforesaid 1,040 tons, but you declined this settlement claiming to be entitled to a far greater sum. The matter became the subject of protracted discussions and has been finally resolved by

a compromise whereby Metal Traders has agreed to pay Ayrton the sum of Forty Thousand Dollars ($40,000.00) and Ayrton agrees that the aforesaid sum of Forty Thousand Dollars ($40,000.00) shall be in full and final settlement of any and all claims of Ayrton with respect to any and all rights which originated out of the joint venture marketing arrangement and the assignment thereof, pursuant to the Agreements of January 24, 1950. It is further agreed that the aforesaid sum of Forty Thousand Dollars ($40,000.00) shall include the claim of $3,400.00 as asserted by Mr. Richard Ayrton for his interest in the joint venture marketing arrangement.

"We now confirm this understanding in writing and shall be obliged if you will indicate your conformity thereto by signing and returning the duplicate of this letter.

··Yours very truly,
METAL TRADERS INC."

# 752

ore of marketable cost and quality was not without uncertainty. As in Burnet v. Logan, supra, the taxpayer here received a "promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty." 283 U.S. at p. 413, 51 S.Ct. at p. 552.

We therefore hold the $40,000 payment to be a capital gain as a payment for the sale of a capital asset, to be reported in Ayrton's fiscal year ending August 31, 1952; we set aside the finding of the Tax Court that the $40,000 is ordinary income, as clearly erroneous; and we remand the case to the Tax Court for the taking of such further proceedings as may be necessary and not inconsistent with this opinion. We affirm the ruling that the $26,000 represents a share of the profits of the joint venture, and is taxable as ordinary income.